1  LEE TRAN & LIANG LLP
   Enoch H. Liang (SBN 212324)
2  enoch.liang@ltlattorneys.com
   Heather F. Auyang (SBN 191776)
3  heather.auyang@ltlw.com
   Lisa J. Chin (SBN 259793)
4  lisa.chin@ltlattorneys.com
   601 S. Figueroa Street, Suite 3900
5  Los Angeles, CA 90017
   Telephone: (213) 612-3737
6  Facsimile: (213) 612-3773

7  Attorneys for Defendants and Counterclaimants
   Zheng Tao Han, Biosuccess Biotech, Co. Ltd.
8  (Cayman), and Biosuccess Biotech, Co. Ltd. (Nevada)

9              **UNITED STATES DISTRICT COURT**

10             **NORTHERN DISTRICT OF CALIFORNIA**

11 RICHARD L. CHANG,                          Case No. 5:14-cv-00426-EJD

12         Plaintiff,                          **DEFENDANTS AND
                                               COUNTERCLAIMANTS**
13     v.                                      **ZHENG TAO HAN,
                                               BIOSUCCESS BIOTECH, CO., LTD.**
14 ZHENG TAO HAN, an individual; and CHI-     **(CAYMAN) AND BIOSUCCESS**
   MING WU A/K/A FRED WU, an individual,      **BIOTECH, CO., LTD. (NEVADA)'S**
15 BIOSUCCESS BIOTECH, CO., LTD., a Cayman    **COUNTERCLAIMS AGAINST**
   Islands Corporation, BIOSUCCESS BIOTECH,   **PLAINTIFF AND COUNTERCLAIM**
16 CO., LTD., a Nevada Corporation, and DOES 1 **DEFENDANT RICHARD L. CHANG**
   through 50, inclusive,
17
           Defendants.
18

19 ZHENG TAO HAN, an individual,
   BIOSUCCESS BIOTECH, CO., LTD., a Cayman    **JURY TRIAL DEMANDED**
20 Islands Corporation, BIOSUCCESS BIOTECH,
   CO., LTD, a Nevada Limited Liability Company,
21
           Counterclaimants,
22
       v.
23
   RICHARD L. CHANG,
24
           Counterclaim Defendant.
25

26

27

28

**COUNTERCLAIMS**

Pursuant to Rule 13 of the Federal Rules of Civil Procedure, Defendants and Counterclaimants Biosuccess Biotech, Co. Ltd., a Cayman Islands Corporation ("Biosuccess Cayman"), Biosuccess Biotech, Co. Ltd., a Limited Liability Company registered in Nevada ("Biosuccess Nevada") (collectively "Biosuccess"), and Zheng Tao Han ("Han") (collectively with Biosuccess, "Defendants,") by and through their attorneys, hereby counterclaim against Plaintiff and Counterclaim Defendant Richard L. Chang ("Chang" or "Plaintiff"), as follows:

**PARTIES**

1. Biosuccess Biotech, Co. Ltd. is a corporation organized under the laws of the Cayman Islands, with its principal place of business in Taiwan at Room 904, 9th Floor, No. 147, Sec. 2, Chien-Kuo North Road, Taipei, Taiwan 10460, R.O.C.

2. Biosuccess Biotech, Co. Ltd., is a Limited Liability Company registered in the state of Nevada ("Biosuccess Nevada"), with its principal place of business in Taiwan at Room 904, 9th Floor, No. 147, Sec. 2, Chien-Kuo North Road, Taipei, Taiwan 10460, R.O.C.

3. Zheng Tao Han is an individual residing in Zhengzhou City, Henan Province, China.

4. Upon information and belief, Richard L. Chang is resides in both the state of New Jersey and California.

**JURISDICTION AND VENUE**

5. This action arises under the patent laws of the United States, 35 U.S.C. Sections 1 *et seq*., and specifically under 35 U.S.C. Section 256, and under the Federal Declaratory Judgment Statute 28 U.S.C. Sections 2201 and 2202.

6. There exists an immediate, actual and justiciable controversy between Defendants and Chang within the meaning of 28 U.S.C. Section 2201 as evidenced by Counterclaim Defendant's filing of the Complaint, and Defendants are seeking a declaratory judgment as to the rights and legal relations between the parties.

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. Sections 1331 and 1338.

**COUNTERCLAIMS AGAINST CHANG**
**Case No. 5:14-cv-00426-EJD**

8.      This Court also has supplemental jurisdiction over the other claims asserted pursuant to 28 U.S.C. Sections 1367 and 1338(b).

9.      In addition, complete diversity exists between the parties, and the amount in controversy exceeds $75,000.  Accordingly, subject matter jurisdiction is also proper in this case under 35 U.S.C. Section 1332.

10.      These Counterclaims arises out of the same transaction and/or occurrence described in Plaintiff's Complaint.

11.      Counterclaim Defendant has consented to personal jurisdiction for this action in this judicial district by filing Plaintiff's Complaint in this action.

12.      Venue over these compulsory counterclaims is proper in this judicial district under 28 U.S.C. Section 1391.

## GENERAL ALLEGATIONS

**A.      The Relationship between Han and Chang and the '814 Patent**

13.      For decades, Dr. Han has worked as a well-respected scientist specializing in the use of 12-O-tetradecanoylphorbol-13 acetate, also known as "TPA," to treat a multitude of diseases, including acute myelogenous leukemia ("AML"), AIDS/HIV for patients who were refractory to standard therapy, and stroke.

14.      Dr. Han is currently a Senior Researcher, Professor, Director, Laboratory of Medicinal Chemistry and Immunology, of Henan Institute of Cancer Research, located in Zhengzhou City, Henan Province, China.  Dr. Han is also the CSO and CTO of Biosuccess Nevada.

15.      In or around 1984, Han first met Chang when he came to the United States; Han and Chang were colleagues at Hoffman-La Roche.  Han suggested to Chang the idea of using TPA to treat humans.  Han also discovered the effect of TPA on late stage leukemia and was responsible for devising all research plans and clinical experiments related to TPA.  Han's ideas and research are the basis for the subject matter disclosed in U.S. Patent No. 6,063,814 (the "'814 Patent"), titled "Phorbol Esters as Anti-Neoplastic and White Blood Cell Elevating Agents."

16.      Chang simply provided the translation of Han's work for the subject matter

**COUNTERCLAIMS AGAINST CHANG**
**Case No. 5:14-cv-00426-EJD**

1    disclosed in the '814 Patent and devised a plan to add himself as a named inventor to any patent

2    applications. That plan included taking control of the patent prosecution for any patent

3    applications filed based on Han's work.

4          17.      As a result, Chang improperly took control and filed U.S. Application No.

5    08/837,085 (the "'085 application") on April 14, 1997. The '085 application listed both Chang

6    and Han as named co-inventors.

7          18.      On May 16, 2000, the '814 Patent issued from the '085 application.

8          19.      Zheng Tao Han is currently listed a named inventor of the '814 Patent.

9          20.      Richard L. Chang is currently listed a named inventor of the '814 Patent.

10         21.      Biosuccess Nevada is currently listed as the sole assignee of the '814 Patent.

11         22.      In a concurrent proceeding in this District, Case No. CV13-01340-JAK, Chang was

12    asked to produce to evidence that he invented any of the subject matter disclosed in the '814

13    Patent. He did not produce any evidence, such as lab notebooks or otherwise. Hence, Chang

14    lacks any evidence to support his claims that he should be a named inventor.

15         23.      Under 35 U.S.C. Section 256, this Court may order correction of the '814 patent

16    and order the Commissioner of Patents to issue a certificate accordingly.

17    **B.**      **Biosuccess is the Leader in TPA Research**

18         24.      Founded in 2005, Biosuccess is a promising biomedical research and development

19    company dedicated to researching 12-O-tetradecanoylphorbol-13 acetate, also known as "TPA,"

20    for the treatment and applications of, *inter alia*, acute myelogenous leukemia ("AML"),

21    AIDS/HIV for patients who were refractory to standard therapy, and stroke. Biosuccess gave TPA

22    a unique designated name of "PD-616." Biosuccess's main goals are to supply drugs to the global

23    market and to obtain both domestic and foreign patent protection.

24         25.      Biosuccess has spent considerable time and effort, as well as millions of dollars

25    towards the research and development of PD-616 for the treatment of AML and stroke, as well as

26    numerous other treatment applications, and has complied valuable research and business data

27    considered trade secrets ("Confidential Information"). Biosuccess's main research operations are

28    based in China under the supervision of Dr. Han and other research scientists. Biosuccess uses the

Confidential Information for, among other things, submissions to the U.S. Food and Drug Administration ("FDA"), and as a basis for filing both domestic and foreign patent applications. Biosuccess's Confidential Information is not public or generally known.

26.     Biosuccess's Confidential Information is contained in various documents and electronic files.  Biosuccess takes great care to maintain the secrecy of its Confidential Information and to prevent disclosure to persons outside the Company, including requiring employees to sign a non-disclosure agreement and abide by the Employee Handbook.

27.     Based on Biosuccess's clinical results, Biosuccess has been involved with two clinical studies.  The first is NCTO 1009931, titled "Phase II Study of TPA Plus Dexamethasone & CMT in Hematologic Malignancies," and the second is NCTO 1795924, titled "Safety and Efficacy Study of PD-616 Plus Cytarabine to Treat Acute Myelogenous Leukemia or Myelodysplastic Syndrome (AML/MDS)."

**C.     Plaintiff Richard Chang's Relationship with Biosuccess**

28.     During all relevant times, Plaintiff Richard Chang was a shareholder, officer, employee, and a member of the Board of Directors of Biosuccess from around August 2006 to January 2013.  Although Richard Chang did not contribute Biosuccess's research data, he had complete and widespread knowledge and access to all of Biosuccess's most sensitive trade secrets, including years of research data related to PD-616 and its proprietary formulations.

29.     Ben Chang is the son of Richard Chang.  In 2006, Ben Chang became a consultant for Biosuccess.  In 2011, Ben Chang was employed by Biosuccess as its Chief Finance Officer, Chief Operating Officer and President for the North America operation.  In his capacity both as a consultant and the operating officer, Ben Chang had complete and widespread knowledge and access to all of Biosuccess's most sensitive trade secrets, including years of research data related to PD-616 and its proprietary formulations.

30.     As a condition of their employment, Richard Chang and Ben Chang were all obligated to protect Biosuccess's confidential business information and trade secrets. For instance, Biosuccess's Employee Handbook provides, in pertinent part, that:

a.     The information protected includes, among other things, "new product research,

1  pending projects and proposals, proprietary production processes, research and development

2  strategies, [and] scientific data."

3      b.      Employees agreed that they would "only share such information with those

4  individuals who have authorized access with prior written approval, from Biosuccess' Chief

5  Financial Officer."

6      c.      Employees agreed that upon termination of employment that they must return all

7  Biosuccess property.

8      31.     In the years 2006, 2008, 2009 and 2010, Chang did not receive a form W-2.

9      32.     Upon information and belief, Chang received unemployment benefits from the

10  State of New Jersey during a period of the relevant time.

11      33.     For at least part of the years 2007, 2011 and 2012, Chang received a form W-2.

12  **D.    The Patent Assignment Agreements**

13      34.     As a predicate to Chang's employment agreement with Biosuccess, around 2006,

14  Biosuccess entered into negotiations with Dr. Han, and Plaintiff to discuss the assignment of all

15  rights, title, and interest of certain patent and patent applications, including United States Patent

16  No. 6,063,814 (the "'814 patent").

17      35.     Upon information and belief, about the time of said negotiations, Dr. Han and

18  Plaintiff alleged that were the owners of the rights, title, and interest of the '814 patent, titled

19  "Phorbol Esters as Anti-Neoplastic and White Blood Cell Elevating Agents," relating to the

20  treatment of neoplastic diseases (leukemia).  Upon information and belief, no patent applications

21  claiming priority to the '814 patent were ever filed or maintained.

22      36.     Upon information and belief, Dr. Han and Plaintiff also alleged that they were the

23  owners of the rights, title, and interest to certain patent applications worldwide, including

24  Australia Patent Application No. 69687/98, European Patent Application Publication No.

25  0986378, Japanese Patent Application No. 2001-520656, and World Intellectual Property

26  Organization Application Publication No. WO/1998/046218 (collectively "the International Patent

27  Applications"), all purportedly relating to the treatment of leukemia.

28      37.     The aforesaid negotiations ultimately led to the signing of an agreement titled,

5          **COUNTERCLAIMS AGAINST CHANG**
           **Case No. 5:14-cv-00426-EJD**

"Assignment of Patent Right & Assignment of Right of Patent Application Agreement," dated October 12, 2006 (referred to herein as "the October 2006 Agreement"). The October 2006 Agreement was executed by Dr. Han and Plaintiff, as the assignors, and by Biosuccess, as the assignee. A copy of the October 2006 Agreement is attached as **Exhibit A**.

38. In 2011, the parties to the October 2006 Agreement executed a *new* version of the assignment agreement (referred to herein as "the Amendment"). The Amendment was purposely back-dated by the parties to August 30, 2006. A copy of the Amendment is attached as **Exhibit B**. The October 2006 Agreement and the Amendment are hereinafter collectively referred to as the "Assignment Agreement."

39. The Amendment, which was executed in 2011, but back-dated to August 2006, is the controlling version of the assignment agreement between the parties. This resulted in novation of the contractual obligations between Dr. Han, Plaintiff and Biosuccess.

40. The terms and conditions of the Amendment were basically the same as the October 2006 Agreement, except for several important differences relating to the timing of payments made to the assignors in Section 3.1(a). [*See* Exh. B at 2].

41. According to the Assignment Agreement, the assignors assigned to Biosuccess all rights, interest and know-how relating to the use of phorbol esters for treating patients for neoplastic diseases (leukemia) and for increasing white blood cell counts under the '814 patent and the International Patent Applications, and for treating HIV/AIDS under pending patent applications. [*See* Exhs. A and B at 1-2, WHEREAS clauses and Sections 1.3 and 1.4]. In consideration of the assignment, Biosuccess agreed to pay to the assignors certain reimbursement, expense and landmark payments, and a total of 36% of the shares of Biosuccess (18% to each assignor). [*See* Exhs. A and B at Sections 3.1 and 3.2].

42. Section 3.2(b) of the October 2006 Agreement provided that Chang was required to take the position of Biosuccess's Chief Technology Officer ("CTO") companywide in consideration of a consulting fee of "US$250,000 annually to be paid evenly on quarterly basis." [*See* Exh. A]. Section 3.2(b) of the Amendment provided that Chang was required to take the position of Biosuccess' Chief Science Officer ("CSO") at its headquarters in consideration of a

COUNTERCLAIMS AGAINST CHANG
Case No. 5:14-cv-00426-EJD

consulting fee "of at least US$250,000 annually or market compatible compensation."  [*See* Exh. B].

**E.      Chang's Representations While Negotiating the October 2006 Agreement**

43.      In 2006, during the negotiation of the assignment, Chang intentionally concealed the fact that all of the International Patent Applications had expired, lapsed, or been abandoned due to lack of maintenance, and could not be prosecuted into patents in their respective nations or territories.

44.      Upon information and belief, Chang was in charge of the filing and maintenance of the International Patent Applications for the assignors, and Dr. Han was unaware of the true status of the International Patent Applications.

45.      During the negotiation of the assignment, Biosuccess relied on Chang's representation of the viability of the International Patent Applications, especially because no further patent applications could be filed claiming priority to the '814 patent.  Chang had a duty to disclose the true status and condition of the International Patent Applications to Biosuccess, as well as to the co-owner of such applications, Dr. Han.

46.      Chang failed to disclose material facts concerning the true status of the International Patent Applications, specifically that each such application had expired, lapsed, or been abandoned, and could not be revived or reinstated.  Such facts formed a material part of the basis upon which Biosuccess agreed to pay Chang a substantial amount of money, recognize him as an 18% shareholder of Biosuccess, and promise future payments and fees.  The International Patent Applications bore directly on the value of the intellectual property rights to be assigned at the time of negotiations.

47.      Had Biosuccess known the actual status of the International Patent Applications, it would have agreed to less favorable terms and compensation to Chang.  In essence, no further patent applications could be filed claiming priority to the International Patent Applications, and no patents would ever have issued from the International Patent Applications.

48.      Around 2006, Chang recommended that his son, Ben Chang, be appointed as the operating officer of the U.S. Subsidiary, whose job duties included administering and maintaining

**COUNTERCLAIMS AGAINST CHANG**
**Case No. 5:14-cv-00426-EJD**

1 Biosuccess's patent applications, including the International Patent Applications.

2      49.    Chang and his son continuously failed to disclose the true status of the International

3 Patent Applications to the Board of Directors and other principals of Biosuccess after the

4 execution of the October 2006 Agreement.  The Board of Directors and other major shareholders

5 of Biosuccess continued to rely upon and entrusted Chang and his son to manage the

6 organization's patent applications.

7      50.    Since the execution of the October 2006 Agreement, Biosuccess has invested

8 hundreds of thousands of dollars to pursue the development of specific treatments and clinical

9 trials related to the '814 patent with notable success.  Phase II clinical trials are ongoing and being

10 conducted by the U.S. Subsidiary pursuant to the regulations of the United States Food and Drug

11 Administration.

12      51.    The value of Biosuccess's innovative leukemia treatment has been substantially

13 reduced as a result of the expiration, abandonment, or lapse of the International Patent

14 Applications since Biosuccess could no longer obtain the exclusive rights in their respective

15 countries or territories.

16      52.    Biosuccess diligently performed its obligations to the assignors pursuant to the

17 Assignment Agreement, to wit: Biosuccess has paid hundreds of thousands of dollars to Chang;

18 Biosuccess recognized Chang as an 18% shareholder of Biosuccess; Chang was also appointed to

19 Biosuccess's Board of Directors and participated in all important decisions concerning the

20 organization's affairs; and Chang was appointed as the CTO/CSO.

21      53.    Chang, on the other hand, has made no or little contribution to the development of

22 the treatments and clinical trials for leukemia, HIV/AIDS or other diseases, and has failed to

23 perform any meaningful work as Biosuccess's CTO and CSO, respectively.

24 **F.**    **Chang's Egregious and Reckless Actions towards Biosuccess**

25      54.    Beginning around 2012 and continuing through today, Chang, with the help of his

26 son Ben Chang, then operating officer of the U.S. Subsidiary, attempted to usurp control of the

27 organization through unethical and outrageous behavior and directly competed with the interests

28 of Biosuccess, including the unauthorized disclosure of trade secrets and proprietary business

information to third parties.

55. Chang was engaged in spreading untrue and misleading statements to the employees of the U.S. Subsidiary regarding his control and influence within the organization, and disclosed confidential business information to others, including the company's payroll information.

56. Chang and his son, Ben Chang, made repeated attempts to induce Dr. Han, who had been faithfully and diligently performing his research duties for Biosuccess pursuant to the Assignment Agreement, to take his research and data and defect with them to outside investors, by offering Dr. Han millions of dollars in return. Dr. Han rejected the Changs' offers.

57. At the knowledge or instruction of Plaintiff, Chang's son registered himself as a managing member of the U.S. Subsidiary without approval by Biosuccess, disseminated false and misleading statements to other employees of the U.S. Subsidiary concerning Plaintiff's power, misappropriated company fund for personal use, and falsified information on documents.

58. In 2012, Biosuccess discovered for the first time that the International Patent Applications had all expired, lapsed or been abandoned before the signing of the October 2006 Agreement and could not be further prosecuted or reinstated.

59. During his employment as Biosuccess's CTO/CSO, Chang amassed most, if not all, of Biosuccess's research data related to PD-616 and its proprietary formulations. Chang then transferred and took this data from Biosuccess in violation of his obligations and without Biosuccess's knowledge and without Biosuccess's permission or authorization.

60. On information and belief, Plaintiff Richard Chang, his son Ben Chang, and other unknown Doe Defendants conspired together to steal Biosuccess's most sensitive trade secrets and other proprietary information for their own benefit and against Biosuccess's interests.

61. On or around January 17, 2013, the CEO and Chairman of Biosuccess, Fred Wu, announced a restructuring of the management in response to the breach of fiduciary duties by Chang and his son. Chang's appointment as the CTO/CSO of Biosuccess and his son's employment as the operating officer of the U.S. Subsidiary were terminated as part of the restructuring effort.

62.     On January 22, 2013, in retaliation to the organizational restructuring initiated by Mr. Wu, Chang sent Biosuccess a notice of termination of the Assignment Agreement allegedly, in part, by reason of Biosuccess's breach of the payment obligations under the Assignment Agreement.

63.     Dr. Han did not participate in any of Chang's misconduct or in Chang's notice of termination.

**G.     Plaintiff Conspired to Form a Competing Company**

64.     In furtherance of the conspiracy and plan to destroy Biosuccess, Chang planned and did in fact use the stolen information from Biosuccess that he had impermissibly retained after his termination in order to start a competing company.

65.     On information and belief Chang approached and brought in Nepia.  On or around July 18, 2013, according to Nepia's S.E.C. filings, Nepia entered into a Memorandum of Understanding and Asset Assignment Agreement with third parties Imagic, LLC dba Rich Pharmaceuticals and Richard L Chang Holdings, LLC to acquire certain alleged assets including United States Patent No. 6,063,814, entitled "Phorbol esters as anti-neoplastic and white blood cell elevating agents" and all related intellectual property associated with the patent.  Upon information and belief, Imagic, LLC is controlled solely by Ben Chang.  Richard L Chang Holdings, LLC is controlled solely by Richard Chang.  According to the SEC filings, cash and stock were exchanged in return.

66.     On July 18, 2013, Nepia appointed Ben Chang as its President, Chief Executive Officer, Chief Financial Officer, Secretary, Treasurer and Director.

67.     Nepia represented in its S.E.C. filings that "Under the direction of our newly appointed officer and director  . . . we intend to pursue the development of PD-616 (12-O-tetradecanoylphorbol-13-acetate) for the treatment of: Acute Myelogenous Leukemia ("AML") and Stroke (for the treatment of loss of function cause by Stroke)  . . . . "

68.     Nepia stated in its S.E.C. filings that "The priority drug development efforts of the Company are focused on the use of PD-616, a naturally occurring compound that has a number of properties that are uniquely suited for the treatment of patients with Acute Myelocytic Leukemia

COUNTERCLAIMS AGAINST CHANG
Case No. 5:14-cv-00426-EJD

(AML). Company scientists had worked with PD-616 in the laboratory for many years studying its ability to convert cancer cells to normal cells, a process called differentiation. It was also observed in some instances to cause cancer cell death. These observations were the basis of the proposal to test PD-616 in relapsed AML patients in China and later in the US and resulted in findings that were sufficiently encouraging to support further interest in this drug to treat."

69.     In fact, Nepia had performed none of the drug development or work stated in the aforesaid S.E.C. filings. Instead, the drug development and clinical work involving PD-616 and its treatment of AML was a result of work funded and performed by Biosuccess. PD-616 is the unique name created by Biosuccess for the new drug and is Biosuccess's proprietary property.

70.     On or around August 12, 2013, Richard Chang recorded with the U.S. Patent and Trademark Office an assignment of United States Patent No. 6,063,814 ("the '814 Patent") and United States Application Nos. 13/745,745 and 13/745,740 to Richard L. Chang Holdings. The contact person and correspondence address for the assignment is his son, Ben Chang, 312 North Mansfield Avenue, Los Angeles, California 90036. Richard Chang also appointed a Power of Attorney to Ben Chang.

71.     However in 2006, Richard Chang had already assigned all his rights under the '814 Patent to Biosuccess by an agreement titled, "Assignment of Patent Right & Assignment of Right of Patent Application Agreement." Said assignment agreement was first recorded on November 14, 2006. That assignment is the subject of the pending litigation in this District, Case No. CV13-01340-JAK.

72.     In July 2013, Rich Pharmaceuticals contacted WuXi AppTec Co., Ltd. ("WuXi") to manufacture TPA. WuXi is the same company that manufactured PD-616 for Biosuccess. Rich Pharmaceuticals used the trade secret and confidential information learned and taken from Biosuccess to facilitate the manufacturing of TPA for their own use. Both Richard Chang and his son Ben Chang participated in the process.

73.     On or around September 3, 2013, Nepia officially changed its name to Rich Pharmaceuticals, Inc. (although the Changs were already using the Rich Pharmaceuticals entity name).

74.   In late 2013, Richard Chang and his son Ben Chang engaged a third party Contract Research Organization, Therinova.  Therinova was to provide "regulatory support to include the development of the US FDA IND Submission Package for Rich Pharmaceuticals's product PD-616."

75.   Therinova's "deliverables" included "Prior data and documentation review:  [] Therinova will review all prior regulatory documentation, research data, and manufacturing information provided by Rich Pharmaceuticals."

76.   Therinova's scope of work was based on the following assumptions: "At the start of this project, the Company will provide to Therinova the following information: 1. Copy of all Regulatory Correspondence and documentation.  2. All Data pertaining to the pre-clinical and clinical development of PD-616.  3.  All information pertaining to the manufacture of PD-616.  4. All additional information needed directly for the US FDA IND Submission."

77.   Richard Chang and Ben Chang did in fact provide numerous confidential Biosuccess documents that they had unlawfully retained to Therinova.

78.   Richard Chang and his son Ben Chang were instrumental in the creation of Rich Pharmaceuticals, a company in direct competition with Biosuccess.

79.   Richard Chang serves as the Chief Scientific Officer and on the Board of Rich Pharmaceuticals.

80.   Rich Pharmaceuticals is a publically traded company under the symbol RCHA.

**COUNT I**

**(Correction of Inventorship)**

**(By Biosuccess and Han against Chang)**

81.   Defendants incorporate the paragraphs above of their Counterclaims as if fully set forth herein.

82.   Han made independent and material contributions to the conception and reduction to practice of significant features of the invention(s) disclosed and claimed in the '814 Patent.

83.   Han is the true and sole inventor of the invention(s) disclosed and claimed in the '814 Patent.

84.     Chang made no independent or material contributions to the conception and reduction to practice of the invention(s) disclosed and claimed in the '814 Patent.

85.     Chang violated 37 CFR 1.56 by signing an oath or declaration attesting that he should be named as an inventor on the '085 application that led to the '814 Patent.

86.     As a result of Chang's actions, Defendants have been and will continue to be substantially and irreparably harmed and damaged by the erroneous inventorship, unless the error in inventorship is corrected.

87.     Pursuant to 35 U.S.C. Section 256, Defendants seeks a certificate of correction removing Chang as a named inventor of the '814 Patent.

**COUNT II**

**(Misappropriation of Trade Secrets - Cal. Civ. Code§ 3426.1 et seq.)**

**(By Biosuccess against Chang)**

88.     Defendants incorporate the paragraphs above of their Counterclaims as if fully set forth herein.

89.     Biosuccess is informed and believes, and on that basis alleges, that Chang is using Biosuccess's Confidential Information, without Biosuccess's consent, to unlawfully compete against Biosuccess.

90.     Biosuccess enjoys an advantage over its existing and would-be-competitors based, in part, on the trade secret information it has developed and implemented in its effort to bring PD-616 to market for the treatment of, among other diseases, leukemia and stroke.

91.     Biosuccess has made reasonable efforts under the circumstances to preserve the confidentiality of its trade secrets.  Such information derives independent economic value (actual and potential) from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use.  Accordingly, the above-described Confidential Information constitutes "trade secrets" under California's UTSA, Cal. Civ. Code Section 3426 *et seq.*

92.     Chang was and remains under a duty both to keep Biosuccess's confidential, proprietary or trade secret information secret, and not to use or disclose such information other

13

than for the benefit of Biosuccess and only with Biosuccess's authorization.  By taking or using this information from Biosuccess without its authorization, Chang knew or should have known that they acquired such information under circumstances giving rise to a breach of a duty to maintain its secrecy and limit its use.

93.     Chang's conduct constitutes misappropriation of Biosuccess's trade secrets through the unauthorized taking, retention and use of Biosuccess's trade secret information.

94.     Chang's actual and threatened misappropriation was and is being carried out without the express or implied consent of Biosuccess.

95.     Chang obtained the Confidential Information described above directly or indirectly from Biosuccess and not generally available information or through its own independent research and efforts.

96.     Chang's actions constitute willful misappropriation and/or threatened misappropriation of Biosuccess's trade secrets under the California's UTSA, Cal. Civ. Code Section 3426 *et seq*.

97.     As a direct and proximate result of Chang's conduct, Chang has been unjustly enriched in an amount to be ascertained at trial, and Biosuccess has sustained, and will continue to sustain, actual damages in an amount to be proven at trial.

98.     Chang's actual and threatened misappropriation of Biosuccess's trade secrets, unless and until enjoined and restrained by order of this Court, is causing and will continue to cause great and irreparable harm to Biosuccess.  Biosuccess is threatened with losing its intellectual property, as well current and potential business and investors.

99.     Pursuant to California Civil Code section 3426.2, Biosuccess is entitled to an injunction to prohibit Chang from using, disclosing or otherwise benefiting from Biosuccess's trade secrets, to eliminate any commercial advantage to Chang that they may otherwise derive from his misappropriation, and to require Chang to immediately return to Biosuccess all information, equipment and other materials which he has wrongfully obtained.

100.     In performing the conduct described herein, Chang acted willfully and maliciously with the intent to injure Biosuccess and to wrongfully advantage himself at Biosuccess's expense.

1    101.    Pursuant to California Civil Code section 3426.3(c), Biosuccess is entitled to an

2    award of punitive and exemplary damages against Chang sufficient to punish and deter them from

3    engaging in such conduct in the future, in an amount to be ascertained at trial.

4    102.    Pursuant to California Civil Code section 3426.4, Biosuccess is also entitled to an

5    award of their attorneys' fees and costs incurred in this action.

6                                          **COUNT III**

7                                **(Breach of Fiduciary Duty)**

8                                **(By Biosuccess against Chang)**

9    103.    Defendants incorporate the paragraphs above of their Counterclaims as if fully set

10   forth herein.

11   104.    As an officer of Biosuccess, Chang was entrusted with maintaining a variety of

12   confidential information and overseeing certain special projects at Biosuccess.  Accordingly,

13   Richard Chang owed Biosuccess a duty of loyalty.  Richard Chang breached his duty of loyalty by

14   the actions described above.

15   105.    As a direct and proximate result of Richard Chang's breach of his duty of loyalty,

16   Biosuccess has suffered, and will continue to suffer, substantial monetary damages in an amount

17   to be proven at trial.

18   106.    As a condition of his employment with Biosuccess, Biosuccess entrusted its trade

19   secrets and other confidential and proprietary information to Chang and reposed confidence in him

20   that he would not disclose the information or use it for his own personal gain.  The trust and

21   confidence Biosuccess reposed in Chang gave rise to a fiduciary duty not to disclose Biosuccess's

22   trade secrets and confidential information or use them for personal gain.

23   107.    Chang has breached this fiduciary duty by disclosing Biosuccess's trade secrets and

24   other confidential information to third parties including Rich Pharmaceuticals and Therinova, and

25   by utilizing Biosuccess's trade secrets and confidential information, without Biosuccess's consent,

26   in connection with Rich Pharmaceuticals.

27   108.    Indeed, in practical terms, it is impossible for Chang to develop and be in the same

28   footing as Biosuccess without breaching his fiduciary duty not to disclose protected information.

**COUNTERCLAIMS AGAINST CHANG**
**Case No. 5:14-cv-00426-EJD**

1      109.    As a direct and proximate result of Chang's breach of this fiduciary duty,

2   Biosuccess has been damaged in an amount to be proved at trial.

3      110.    Biosuccess is entitled to an award of punitive and exemplary damages against

4   Chang sufficient to punish and deter them from engaging in such conduct in the future, in an

5   amount to be ascertained at trial.

6                                    **COUNT IV**

7                    **(Unfair Competition Pursuant to California Business**

8                    **and Professions Code Section 17200, *et seq.*)**

9                          **(By Biosuccess against Chang)**

10     111.    Defendants incorporate the paragraphs above of their Counterclaims as if fully set

11  forth herein.

12     112.    Biosuccess is informed and believes, and on that basis alleges, the above-described

13  conduct of the Chang constitutes unlawful and unfair business practices in violation of California

14  Business and Professions Code Section 17200, *et seq*.

15     113.    Chang's unlawful business practices include, without limitation, misappropriation

16  of Biosuccess's trade secrets, acts of conversion, breaches of fiduciary duty, and other wrongs

17  described herein.

18     114.    Chang has acted deliberately with the intent to unfairly benefit from the expense,

19  time, effort and labor expended by Biosuccess in the research and development of PD-616 and its

20  confidential intellectual property related thereto, and with a callous disregard for Biosuccess's

21  rights.

22     115.    Pursuant to California Business and Professions Code Section 17203, Chang is

23  required to restore to Biosuccess all property acquired by means of Chang's unfair competition

24  with Biosuccess.

25     116.    As a result of Chang's conduct, Chang has been or will be unjustly enriched in an

26  amount to be proven at trial, for which Biosuccess seeks restitution.

27     117.    As a result of the actions of Chang, Biosuccess has suffered and will continue to

28  suffer irreparable harm unless and those unlawful business practices will continue to cause such

1     irreparable harm until Chang's conduct is enjoined.

2                                   **COUNT V**

3               **(Unfair Competition under California Common Law)**

4                      **(By Biosuccess against Chang)**

5         118.     Defendants incorporate the paragraphs above of their Counterclaims as if fully set

6 forth herein.

7         119.     The above-described conduct of the Chang constitutes unfair competition under the

8 common law of the State of California.

9         120.     Because Chang's conduct has been intentional and willful and in conscious

10 disregard of the rights of Biosuccess, Biosuccess is entitled to punitive damages against Chang.

11                                   **COUNT VI**

12        **(For Conversion of Trade Secrets and Other Confidential Information)**

13                      **(By Biosuccess against Chang)**

14         121.     Defendants incorporate the paragraphs above of their Counterclaims as if fully set

15 forth herein.

16         122.     Biosuccess jointly developed and is an owner of the trade secrets and other

17 confidential and proprietary information involved with the research and development of PD-616.

18         123.     In the course of working on the research and development of PD-616 in direct

19 competition to Biosuccess, Chang has converted for his own use, Biosuccess's trade secrets and

20 confidential information.

21         124.     Biosuccess is entitled to an order that Chang cease and desist all use and

22 disposition of its trade secrets and confidential information in connection with PD-616.

23         125.     As a direct and proximate result of the Chang's acts of conversion, Biosuccess has

24 suffered damages due to, among other things, the lost value of its trade secrets and confidential

25 information.

26         126.     Chang's conversion of Biosuccess's property is oppressive and malicious. As a

27 result of such conduct, Biosuccess is entitled to punitive damages pursuant to California Civil

28 Code Section 3294 against Chang in an amount to be proved at trial.

**COUNT VII**

**(Conversion of Property)**

**(By Biosuccess against Chang)**

127.     Defendants incorporate the paragraphs above of their Counterclaims as if fully set forth herein.

128.     Through the acts and actions described herein above, Chang has improperly appropriated the intellectual property of Defendants.

129.     Defendants are entitled to the return of the intellectual property and an accounting for damages adequate to compensate for the use, in an amount at least equal to a reasonable royalty under 35 U.S.C. Section 284.

**COUNT VIII**

**(Declaratory Relief on Written Contract)**

**(By Biosuccess against Chang)**

130.     Defendants incorporate the paragraphs above of their Counterclaims as if fully set forth herein.

131.     An actual controversy has arisen and now exists between Biosuccess and Chang regarding their respective rights and obligations under the Assignment Agreement, as evidenced by Counterclaim Defendant's filing of his Complaint.

132.     The controlling version of the Assignment Agreement is the Amendment, which was executed in 2011 and back-dated to August 30, 2006; however, Chang's Complaint appears to contend that the October 2006 Agreement is the controlling version.  The Amendment is a valid, enforceable contract, and Biosuccess has substantially performed each and every term and condition set forth therein or otherwise was excused from performance by virtue of Chang's conduct.

133.     Additionally, the assignment of patent and patent applications granted under the Assignment Agreement was an automatic or absolute assignment, and not an assignment with conditions subsequent.  Chang's Complaint appears to suggest that the Assignment Agreement can be terminated by him by reason of certain alleged non-payment seven years after the execution

1  thereof.

2      134.    Biosuccess has diligently performed its obligations under the Assignment

3  Agreement.  Even if Biosuccess had indeed stopped paying Chang since January 2013 after his

4  breach of the Assignment Agreement and breach of his fiduciary duties to Biosuccess, Chang

5  should have no right to terminate or rescind the assignment.  The proper relief for Chang to seek

6  should be monetary damages.

7      135.    Biosuccess has invested hundreds of thousands of dollars and resources in the

8  development and clinical trials of the treatments of several diseases in reliance on the validity of

9  the assignment.  To interpret that the Assignment Agreement could be terminated by Chang due to

10  an alleged non-performance of a condition subsequent would be extremely unjust and inequitable

11  to Biosuccess.

12      136.    Biosuccess seeks a judicial determination of its rights and duties under the

13  Assignment Agreement and declaration that: (i) the Amendment is the controlling version of the

14  Assignment Agreement; and (ii) the assignment of patent and patent applications contemplated in

15  the Assignment Agreement is an automatic and absolute assignment and cannot be terminated or

16  rescinded by Chang.  A judicial declaration is necessary and appropriate at this time under the

17  circumstances herein.

18                               **COUNT IX**

19         **(Breach of Contract – Failure to Maintain Confidentiality)**

20                 **(By Biosuccess against Chang)**

21      137.    Defendants incorporate the paragraphs above of their Counterclaims as if fully set

22  forth herein.

23      138.    With respect to Confidential Information, Article 6.1 of the Assignment Agreement

24  requires Chang to "take such precautions as [he] normally takes with its own confidential and

25  proprietary information to prevent disclosure to third parties."

26      139.    Chang breached the agreement with Biosuccess to maintain the confidentiality of

27  Biosuccess's Confidential Information and other proprietary information by disclosing

28  Confidential Information and other proprietary information to Rich Pharmaceuticals and other

third parties, such as Therinova.

140. Biosuccess performed all conditions precedent to enforcement of the Agreement.

141. Defendants have suffered actual damages in an amount to be determined by the trier of fact.

### COUNT X

### (Breach of Contract – Failure to Fulfill Duties as the CTO/CSO)

### (By Biosuccess against Chang)

142. Defendants incorporate the paragraphs above of their Counterclaims as if fully set forth herein.

143. Section 3.2(b) of the October 2006 Agreement required Chang to take the position of Biosuccess's CTO companywide in consideration of a $250,000 annual consulting fee. [*See* Exh. A]. Section 3.2(b) of the Amendment required Chang to take the position of Biosuccess's CSO at its headquarters in consideration of a consulting fee "of at least US$250,000 annually or market compatible compensation." [*See* Exh. B].

144. Chang failed to perform his duties as Biosuccess's CTO and CSO, respectively, either at its headquarters or any other location, including making any meaningful contribution to the development of the treatments and clinical trials for leukemia, HIV/AIDS or other diseases.

145. Biosuccess complied with the contract's terms. To wit, it has fulfilled all duties, obligations and conditions precedent with regard to the Assignment Agreement.

146. As set forth above, Chang has substantially and materially breached the terms of the Assignment Agreement by failing to fulfill his role as the CTO/CSO.

147. Plaintiff breached the contract's implied covenant of good faith and fair dealing by attempting to evade the spirit of the bargain, utilizing subterfuges and inaction to evade his obligations, and willfully rendering imperfect performance.

148. Despite demand, Chang has failed and refused to remedy his breach of the Assignment Agreement.

149. Biosuccess has suffered and will continue to suffer substantial damages as a result of Chang's breach of the Assignment Agreement; and, Biosuccess has been damaged in an amount

1    to be determined at trial.

2        150.    Biosuccess is entitled to a judicial declaration that Chang failed to fulfill his duties

3    under the Assignment Agreement to act as the CTO/CSO, resulting in any of Biosuccess's alleged

4    failure to comply with any alleged obligations under the Assignment Agreement excused by

5    Plaintiff's own breach of that agreement; and that no additional compensation for consultancy

6    services pursuant to Section 3.2(b) is owed to Chang.

7                                    **COUNT XI**

8        **(Breach of Contract – Assignment of the International Patent Applications)**

9                        **(By Biosuccess against Chang)**

10        151.    Defendants incorporate the paragraphs above of their Counterclaims as if fully set

11    forth herein.

12        152.    As part of the large consideration paid to Chang, Section 1.3 of the Assignment

13    Agreement required the assignment of the International Patent Applications to Biosuccess.

14    Biosuccess agreed to such consideration as set forth in the Assignment Agreement on the

15    assumption that the International Patent Applications were viable, *i.e.*, that such applications were

16    pending and could be used as basis for obtaining patent rights outside the United States.

17        153.    Chang failed to disclose the true status of the International Patent Applications

18    before the execution of the October 2006 Agreement, and with his son's help, continuously failed

19    to disclose the true status of the International Patent Applications to the Board of Directors and

20    other principals of Biosuccess after the execution of the October 2006 Agreement.  The Board of

21    Directors and other major shareholders of Biosuccess continued to rely upon and entrusted Chang

22    and his son to manage the organization's patent applications.

23        154.    In 2012, Biosuccess discovered for the first time that the International Patent

24    Applications had all expired, lapsed or been abandoned before the signing of the October 2006

25    Agreement and could not be further prosecuted or reinstated.

26        155.    Biosuccess complied with the contract's terms.  To wit, it has fulfilled all duties,

27    obligations and conditions precedent with regard to the Assignment Agreement.

28        156.    As set forth above, Chang has substantially and materially breached the terms of

the Assignment Agreement by failing to assign viable International Patent Applications and by concealing the true status of such applications.

157.    Plaintiff breached the contract's implied covenant of good faith and fair dealing by attempting to evade the spirit of the bargain, utilizing subterfuges and inaction to evade his obligations, and willfully rendering imperfect performance.

158.    Biosuccess has sustained irrevocable damages in that its innovative treatment of leukemia cannot be properly protected outside the United States.

159.    Biosuccess has suffered and will continue to suffer substantial damages as a result of Chang's breach of the Assignment Agreement; and, Biosuccess has been damaged in an amount to be determined at trial.

### COUNT XII

**(Fraud)**

**(By Biosuccess against Chang)**

160.    Defendants incorporate the paragraphs above of their Counterclaims as if fully set forth herein.

161.    Chang knowingly misrepresented and concealed the true status of the International Patent Applications during negotiations of the assignment, and continued to conceal the true status of the International Patent Applications after execution of the Assignment Agreement. Specifically, no further patent applications could be filed claiming priority to the International Patent Applications, and no patents would have ever issued from the International Patent Applications because the International Patent Applications had expired, lapsed or been abandoned and could not be reinstated.

162.    Chang's representations were material in that Biosuccess would not have entered into the Assignment Agreement with such favorable terms to Chang, including issuing 18% of company shares to Chang, appointing Chang to the Board of Directors, and agreeing to, among other things, pay compensation and landmark payments, had it known the truth. Chang concealed these omissions in order to deceive Biosuccess into believing it was receiving viable patent applications for enforcement outside the United States and to induce Biosuccess into granting him

1  more favorable terms under the Assignment Agreement.

2  163. The representations made by Chang were made with knowledge that they were

3  false, conscious ignorance of the truth, or recklessness as to whether the representations were true

4  or false.

5  164. The representations made by Chang were made with the intent of misleading

6  Biosuccess into relying on them and with the intent of inducing Biosuccess to execute the

7  Assignment Agreement on terms more favorable to Chang than would have otherwise occurred.

8  165. Biosuccess relied on the above-described fraudulent misrepresentations made by

9  Chang. Their reliance was justifiable in that Chang and other members of Biosuccess's Board of

10 Directors had known one another for over 5 years before the October 2006 Agreement was

11 negotiated, and had long standing personal and business relationships.

12 166. Biosuccess has sustained irrevocable damages in that its innovative treatment of

13 leukemia cannot be properly protected outside the United States.

14 167. The above-described damages suffered by Biosuccess are the proximate result of

15 Chang's above-described fraudulent material misrepresentations and Biosuccess' justifiable

16 reliance thereon; and, Biosuccess has been damaged in an amount to be determined at trial.

17 **COUNT XIII**

18 **(Negligent Misrepresentation)**

19 **(By Biosuccess against Chang)**

20 168. Defendants incorporate the paragraphs above of their Counterclaims as if fully set

21 forth herein.

22 169. Chang made the above-described misrepresentation of material facts.

23 170. Chang made the misrepresentations under circumstances in which Chang had a

24 duty to know and to disclose their falsity.

25 171. Chang made the misrepresentations with reckless disregard which led Biosuccess

26 into executing the Assignment Agreement.

27 172. Chang's misrepresentations resulted in injury to Biosuccess who acted in justifiable

28 reliance on the misrepresentations.

**COUNTERCLAIMS AGAINST CHANG**
**Case No. 5:14-cv-00426-EJD**

173.  The above-described damages suffered by Biosuccess are the proximate result of Chang's above-described wrongful conduct and Biosuccess's justifiable reliance thereon; and, Biosuccess has been damaged in an amount to be determined at trial.

## COUNT XIV

### (Unjust Enrichment)

### (By Biosuccess against Chang)

174.  Defendants incorporate the paragraphs above of their Counterclaims as if fully set forth herein.

175.  In providing to Chang more than adequate consideration in the form of, among other things, past and future monetary compensation and shares of Biosuccess stock, Biosuccess conferred a benefit upon Chang, the value of which greatly exceeds the value of the intellectual property rights actually assigned to Biosuccess.  In addition Chang obtained benefits by his inclusion in the management of Biosuccess by his appointment to the Board of Directors.  Chang has knowledge of, and has voluntarily accepted and retained, all such benefits.

176.  The circumstances are such that it would be unjust and inequitable for Chang to retain such benefits without paying the value thereof to Biosuccess in an amount to be determined at trial.

## COUNT XV

### (Breach of Fiduciary Duty)

### (By Biosuccess against Chang)

177.  Defendants incorporate the paragraphs above of their Counterclaims as if fully set forth herein.

178.  During the relevant times, Chang was a shareholder, a key officer, and a member of the Board of Directors of Biosuccess.  By virtue of Chang's status with Biosuccess, he owed Biosuccess a fiduciary duty.  This duty includes, among other things, the responsibility to properly manage the corporation, exercise reasonable skill and care in such management, account for its funds, and not to compete with Biosuccess' business or interests.

179.  Chang breached those fiduciary duties by, among other things, the acts, errors and

1  omissions set forth above.  As one example, in direct competition with and against Biosuccess's

2  interests, Chang attempted to lure Dr. Han to leave Biosuccess and take his research, data, and

3  know-how, and defect with Chang to outside investors by offering Dr. Han millions of dollars in

4  return.

5         180.    As a direct and proximate result of Chang's breach of fiduciary duties, Biosuccess

6  suffered substantial damages in an amount to be proven at trial, including attorneys' fees and costs

7  of suit.

8                        **DEFENDANTS' PRAYER FOR RELIEF**

9         WHEREFORE, Defendants pray for the following relief:

10        A.      That the Court enter judgment in favor of Defendants and against Chang;

11        B.      That the Court dismiss Chang's Complaint with prejudice;

12        C.      That the Court declare that Dr. Han is the sole inventor of the '814 Patent and any

13  subject matter arising from the inventions disclosed or claimed;

14        D.      That the Court issue an order pursuant to 35 U.S.C. Section 256, requiring the

15  Director of the United States Patent and Trademark Office to correct inventorship of the '814

16  Patent;

17        E.      That Chang, his officers, agents, servants, employees, and all persons in active

18  concert or participation with them, be preliminarily and permanently restrained and enjoined from

19  misappropriating, disclosing or using Biosuccess's confidential information and trade secrets.

20        F.      For restoration of Dr. Han's ownership and economic interest in and to the '814

21  Patent;

22        G.      For an accounting for damages sufficient to compensate for the unauthorized and

23  improper use by Chang of the intellectual property protected by the '814 Patent;

24        H.      That the Court make a determination and declare that:

25              (i)     The Amendment is the controlling version of the Assignment Agreement;

26                      and

27              (ii)    The assignment of patent and patent applications contemplated in the

28                      Assignment Agreement is an automatic and absolute assignment and cannot

1  be terminated or rescinded by Chang;

2  I.  That the Court make a determination and declare that:

3      (i)  Chang failed to fulfill his duties under the Assignment Agreement to act as

4           the /CSO and any of Biosuccess' alleged failure to comply with any alleged

5           obligations under the Assignment Agreement excused by Chang's own

6           breach of that agreement;  and

7      (ii) that no additional compensation for consultancy services pursuant to

8           Section 3.2(b) is owed to Chang;

9  J.  For general, specific, and consequential damages according to proof at trial;

10 K.  For exemplary and punitive damages in a sum according to proof at trial;

11 L.  For injunctive relief barring Chang from attempting to rescind or terminate the

12 Assignment Agreement;

13 M.  For a proportionated or equitable reduction to Chang of both the shares of stock

14 issued and of Biosuccess's past and future payment obligations to reflect the reasonable value of

15 the intellectual property rights actually assigned to Biosuccess;

16 N.  For the costs of suit and reasonable attorneys' fees; and

17 O.  For any other and further relief as the Court deems just and proper in this case.

18                  **DEMAND FOR A JURY TRIAL**

19 Defendants and Counterclaimants hereby demand a jury trial on all issues so triable.

20

21 Dated:  April 14, 2014                **LEE TRAN & LIANG LLP**

22

23                          By:   /s/ Enoch H. Liang
                                Enoch H. Liang
24                          Attorneys for Defendants and Counterclaimants
                            Zheng Tao Han, Biosuccess Biotech, Co. Ltd.
25                          (Cayman), and Biosuccess Biotech, Co. Ltd.
                            (Nevada)

26

27

28

**COUNTERCLAIMS AGAINST CHANG**
**Case No. 5:14-cv-00426-EJD**

# EXHIBIT A



## ASSIGNMENT OF PATENT RIGHT & ASSIGNMENT OF RIGHT OF PATENT APPLICATION
### AGREEMENT

AGREEMENT made this    day of    , 2006, by and between Richard L. Chang of 107 Konner Ave. Pine Brook, New Jersey, United States of America and Zheng Tao Han of 4 Dongming Road, Zheng Zhou, Hunan, China (hereinafter jointly referred to as "ASSIGNOR "). and Biosuccess Biotech Co., Ltd., a company organized and existing under the laws of the Cayman Islands, registered at P.O.Box 30592-SMB Cayside, 2nd Floor Harbour Drive, George Town, Grand Cayman, Cayman Islands, B.W.I., having its central operations office located at 7F-1, No. 577, Lin-Shen North Road., Taipei, Taiwan 10460, R.O.C. (hereinafter referred to as "ASSIGNEE").

### WITNESSETH:

WHEREAS, ASSIGNOR is the owner of the patents and patent applications as hereinafter defined relating to inter alia the use of phorbol esters for treating patients for neoplastic diseases ( leukemia ), for increasing white blood cell counts and for HIV/AIDS;

WHEREAS, ASSIGNOR do hereby assign all my/our rights and interests of  , under the aforesaid patent applications and patents and the Know-How relating thereto for use in relation treating patients for elevation of white blood cell counts, anti-neoplastic and HIV/AIDS;

WHEREAS, ASSIGNEE wishes to obtain the assignment of the patents and patent applications, for treating patients with phorbol esters for elevation of white blood cell counts, anti-neoplastic and for HIV/AIDS, under said patent applications and patents and the Know-How relating thereto;

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and obligations herein contained, the parties hereto agree as follows:

### ARTICLE 1 - Definitions:

1.1        "Know-How" shall mean all technology, formula, trade secrets, technical, toxicological, pharmacological, scientific and/or medical data and any other information or experience (including, but not limited to, preclinical or clinical data), owned, controlled, possessed or received by ASSIGNOR as of the date of execution of this Agreement specifically

ZTH    RLC

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY UNDER THE CONFIDENTIALITY ORDER        BB0016642

relating to the Product and which it is at liberty to disclose, including, but not limited to, such data or information which will allow ASSIGNEE to efficiently manufacture, use or sell Assigned Product.

1.2       "Assigned Product" shall mean esters of phorbol, pharmaceutically acceptable acid addition salts thereof and any finished dosage form thereof when manufactured, used, offered for sale or sold for elevation of white blood cell counts, anti-neoplastic, ( leukemia ) and HIV/AIDS.

1.3       "Patent Rights" shall mean all of ASSIGNOR's right, title and interest in and to the U.S. Patent No. 6063814 dated 16 May 2000 and patent applications, including AU6965798A1, EP0965378A1, EP0965378A4, JP2001520856T2, and WO9846216A1, and any division, extension, reissue or reexamination thereof, together with

1.4       "Right of Patent Application" shall mean the new filing of US patent application for HIV/AIDS   ( U.S. patent application No. _____ filed on _____ entitled _____.

And subsequent patent application rights to be filed to other countries other than U.S..

## ARTICLE 2 – Grant:

2.1       ASSIGNOR represents and warrants that it is the owner of the Patent Rights and the Know-How, which does not infringe any patent or other rights of any third party.

2.2       In the event that ASSIGNOR shall obtain a patent on the Know-How, ASSIGNOR shall grant to ASSIGNEE free of charge, consistent with the terms of this Agreement, to practice the Know-How in conjunction with the Licensed Product, and to make, have made, use and sell Assinged Product under such patent.

## ARTICLE 3 – Terms & Conditions

3.1       ASSIGNEE agrees to the following expenditures:

a.  Total payment: US$2 million to be paid in the following manners:

(1) One million US Dollar - Reimbursement of Efforts and Expenses Spent over the years on TPA research and development is to be paid at the time of singing agreement and having all signed necessary patent documents ready for assignment to the

2T4

RLC

- 2 -

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY UNDER THE CONFIDENTIALITY ORDER          BB0016643

ASSIGNEE

(2) One million US Dollar is to be paid by 2/28/2007 –

    (a) 50% of which is for the patent right as described in Article 1.3 ;

    (b) 50% of which is for the patent application right as described in Article 1.4

b. Total company shares to own: 38% of the total ASSIGNEE's shares, which is guaranteed to be maintained as is without being affected due to dilution of any kind up to the stage of company's Pre-IPO.

3.2    The CONSIGNEE also agrees to the following overhead expenses:

    a.  Incentives

        A US$1 million dollar to be granted to the CONSIGNOR after each ( disease indication ) of the clinical trial entering into the phase III stage respectively in the U.S.

    b.  Consulting fees: US$250,000 annually to be paid evenly on quarterly basis and the CONSIGNOR is required to take on the following positions namely, which could be subject to change as company grows:

        Professor Richard L. Chang – CTO, companywide

        Professor Zheng Tao Han – VP, R&D China

    c.  Travel expenses related to conduct consultancy services will be at ASSIGNEE's expenses, complying with ASSIGNEE's travel expenses procedure & policy to be set-up.

3.3    ASSIGNEE shall provide ASSIGNOR with detailed and complete written report of the progress and results of the development of the Assigned Product on a semi-annual basis. Additionally, meetings shall be held at least once every three months.

3.4    ASSIGNOR has rights to conduct auditing over ASSIGNEE's accounting statement at least on semi-annual basis with prior notice to ASSIGNEE, which can be done through outside CPA firm after coordinating with ASSIGNEE in advance.

### ARTICLE 4 - Infringement and Indemnifications:

4.1    The parties shall promptly notify each other of a challenge to the

*ZTH*

*RLC*

- 3 -

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY UNDER THE CONFIDENTIALITY ORDER

BB0016644

validity or enforceability of the Patent Rights or Know-How, ASSIGNEE shall have the opportunity to control the defense thereof on behalf of both parties. ASSIGNOR agrees to cooperate with ASSIGNEE and to execute any documents relating to such action.

   4.2    In the event that in the exercise of rights granted under this agreement, ASSIGNEE is threatened with or subject to a suit for infringement of a patent owned by a third party, ASSIGNEE will advise ASSIGNOR and consult in good faith with ASSIGNOR as to whether and how to respond. Subject to reimbursement for its costs, ASSIGNOR shall provide reasonable assistance to ASSIGNEE in the event that either both of them is subject to such suit. ASSIGNOR shall have no obligation to ASSIGNEE with respect to any liability that either or both of them shall incur as a result of any such suit or threat.

   4.3    ASSIGNEE agrees that there are no any challenges or procures or assists others in a challenge to the validity of the assigned Patent Rights.

   4.4    ASSIGNEE shall defend, indemnify and hold harmless ASSIGNOR from and against any and all claims, demands, losses and expenses of any nature, including attorneys' fees, including but not limited to, death, personal injury, illness, property damage or products liability, arising from or in connection with any of the following:

     (a)  the use by ASSIGNEE or Affiliates of any method or process covered by the Patent Rights or disclosed in the Know-How;

     (b)  any use, sale or other disposition of Product by ASSIGNEE, or any statement, representation or warranty of ASSIGNEE with respect thereof.

The indemnification set forth herein shall not be applicable in the event that the claim, demand or lawsuit in question arises from the negligence, or willful or improper act, of ASSIGNOR.

   4.5 The ASSIGNEE shall obtain and maintain in force product liability insurance for any and all countries wherein any Assigned Product shall be manufactured, sold, distributed or advertised and shall name ASSIGNOR as one of the insureds or additional insureds where appropriate.

### ARTICLE 5 · Term/Termination:

   5.1 The Agreement shall be considered to be completed in terms of

*ZTH*

– 4 –

*RLC*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY UNDER THE CONFIDENTIALITY ORDER

BB0016645

5.1 The Agreement shall be considered to be completed in terms of assignment of patent right and right of patent application to the ASSIGNEE as soon as the fulfillment of Article 3.1.a and 3.1.b by the ASSIGNEE, unless terminated sooner pursuant to the provisions of this Agreement.

5.2 Upon termination under this Article 5.2, if it should occur for any causes, as of the effective date of the termination and, from and after said effective date of termination under this Article 4.2, ASSIGNEE shall have no further right to use any Know-How imparted to it by ASSIGNOR hereunder. In the event of such termination, ASSIGNEE shall have no further obligations to ASSIGNOR, except for those set out in Articles 4.4 (which is not terminable) and to provide ASSIGNOR promptly with all data relating to the Assigned Product in its possession at the date of such termination. ASSIGNOR shall have the right to use such data provided however it chooses, including the right to supply same to a subsequent assignee. In the event that one or more applications for drug investigation or marketing approval has been filed by or granted to ASSIGNEE thereof as of the date of termination under this Article 5.2, ASSIGNEE shall assign or procure the assignment of such application or approval to ASSIGNOR free of charge.

5.3 In the event of a breach of, or default under, this Agreement by ASSIGNEE is not cured within sixty (60) days after the receipt of written notice thereof from ASSIGNOR, ASSIGNOR shall be entitled (without prejudice to any of its other rights) to terminate this Agreement by giving notice to take effect immediately.

5.4 ASSIGNOR shall have the right to terminate this agreement forthwith in the event of ASSIGNEE's filing the bankruptcy.

5.5 The right to terminate this Agreement pursuant to this Article 5 shall not be affected in any way by a waiver of, or failure to take action with respect to, any previous breach or default. Termination of this Agreement shall not affect the rights and/or obligations of the parties accrued prior to termination.

## ARTICLE 6 - Know-How, Information, Improvements and Confidentiality:

6.1 ASSIGNOR agrees that it shall:

a) disclose to any of the Know-How in its possession or provided to it under this Agreement to the ASSIGNEE without any reservation and, b) take such precautions as it normally takes with its own confidential and proprietary information to prevent disclosure to third parties (except Affiliates and consultants as above).

2TH

RLC

- 5 -

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY UNDER THE CONFIDENTIALITY ORDER

BB0016646

6.2     The obligation of ASSIGNOR under Article 5.2 shall not, in any event, apply to any information which it can show:

a)     at the time of disclosure is, or thereafter becomes, available to the public in published literature or otherwise through no fault of ASSIGNOR; or

b)     was known to, or otherwise in the possession of, ASSIGNEE or Affiliates, or consultants of ASSIGNEE prior to the receipt of such information from ASSIGNOR ; or,

c)     is obtained by ASSIGNEE from a source other than ASSIGNOR and other than one who would be breaching a commitment of confidentiality to ASSIGNOR by disclosing such information to ASSIGNEE.

### ARTICLE 7 - Patent Maintenance and Extension:

7.1     ASSIGNEE shall bear the cost of obtaining patents on the patent applications set out in Article 1.5 and attends to and bears the cost of maintaining patent rights throughout the life of said rights in USA, and other countries where applicable.

7.2     Whenever it is possible and there is a reasonable prospect of success, ASSIGNEE shall apply for extension of the Patent Rights within any period prescribed for such application.  It would be the responsibility of ASSIGNEE to work with its agent with respect to such filing and prosecution of action and agrees to cooperate with said agent in providing any information required under any relevant laws, and any regulations promulgated thereunder.  All expenses of such proceedings shall be borne by ASSIGNEE.

7.3     The proprietary rights to any improvements and modifications on the patents licensed hereby, including but not limited to patent, copyright, trade secrets and other related rights, shall be vested in ASSIGNEE.

### ARTICLE 8 - Publicity:

8.1     ASSIGNOR and ASSIGNEE agree NOT to issue any press release or other public statement disclosing the existence of or relating to this Agreement without the prior written consent of the other party, provided, however, that neither party hereto shall be prevented from complying with any duty of disclosure he or it may have pursuant to law.

### ARTICLE 9 - Notices:

9.1     Any notice or communication required or permitted to be given or made under this Agreement by one of the parties hereto to the other shall be in writing and shall be

ZTH

- 6 -

R+C

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY UNDER THE CONFIDENTIALITY ORDER

BB0016647

deemed to have been sufficiently given or made for all purposes when mailed by certified mail, return receipt requested, postage prepaid, addressed to such other party at its respective address as follows:

> To ASSIGNOR :
> Attention:   Richard L. Chang & Zheng Tao Han
>
> To ASSIGNEE :
> Attention:   Fred Chi-Ming Wu, Biosuccess Biotech Co. Ltd

### ARTICLE 10 - Force Majeure:

10.1   Neither party shall be responsible or liable to the other hereunder for failure or delay in performance of this Agreement due to any war, fire, accident or other casualty, or any labor disturbance or act of God or the public enemy, or any other, whether similar or dissimilar to the foregoing, contingency beyond such party's reasonable control.   In addition, in the event of the applicability of this Article, the party failing or delaying performance shall use its best efforts to eliminate, cure and overcome any of such causes and resume performance of its obligations as soon as reasonably possible under the circumstances.   If either party finds that it is subject to conditions as set out in this article that may delay or preclude its performance of any of its obligations under this agreement it shall promptly advise the other thereof.

### ARTICLE 11 - Assignment and Transfer:

11.1   Any subsequent applications of phorbol esters for treating patients for other diseases by the ASSIGNOR would be considered to be the rights of the ASSIGNEE. And any subsequent patents and patent applications granted for the ASSIGNOR for other diseases or indications would also be considered to the right and interests of and the ownership of the ASSIGNEE.

11.2   Any "Know-How" developed subsequently relating thereafter the Agreement is in effect will also be considered to be the right and interests of ASSIGNEE.

### ARTICLE 12 - Severability:

*ZTH*

- 7 -

*Ric*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY UNDER THE CONFIDENTIALITY ORDER

BB0016648

12.1   If any one or more of the provisions of this Agreement shall, for any reason be held by any court, tribunal or other authority having jurisdiction over either of the parties hereto or this Agreement, be held to be invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions here shall not in any way be affected or impaired thereby.  In the event any provision shall be held invalid, illegal or unenforceable, the parties shall use their best efforts to substitute a valid, legal and enforceable provision, which, insofar as practical, implements the intent of the parties and the purposes hereof.

### ARTICLE 13 – Governing Law and Jurisdiction:

13.1   This Agreement shall be construed and the rights of the parties governed in accordance with the laws of the state of New Jersey, U.S.A., excluding its rules relating to conflict of laws.

### ARTICLE 14 – Entire Agreement:

14.1        This Agreement constitutes the entire understanding of the parties with respect to the subject matter contained herein and may not be modified or amended except as expressly stated herein or by a written agreement duly executed by both parties hereto.

### ARTICLE 15 – Miscellaneous Provisions:

15.1   The titles of the Article of this Agreement are for general information and reference only and this Agreement shall not be construed by reference to such titles.

15.2   It is expressly agreed that this agreement does not authorize either party to act or hold itself out or be held out as the agent of the other.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in duplicate by their duly authorized representatives as of the day, month and year first above written, each copy of which shall for all purposes be deemed to be an original.

ASSIGNOR:  Richard L. Chang             ASSIGNOR:  Zheng Tao Han

By:  _Richard L Chang_        By  _Zheng Tao Han_

– 8 –

$27H$           $RLC$

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY UNDER THE CONFIDENTIALITY ORDER        BB0016649

Name: *Richard L Chang*

Title: *CTO*

Date: *10-12-2006*

Name : *Zheng Tao Han*

Title: _____

Date : *10-12-2006*

**ASSIGNEE: Biosuccess Biotech Co., Ltd.**

By: _____

Name: *Fred C. M. Wu*

Title: *Chairman*

Date: *10-12-2006*

RLC          ZTH

- 9 -

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY UNDER THE CONFIDENTIALITY ORDER

EXHIBIT B

EXHIBIT

101

**Assignment of Patent Right & Assignment of Right of Patent Application Agreement**

Agreement was made this 30th day of August, 2006, by and between Richard L. Chang of 107 Konner Ave. Pine Brook, New Jersey, United States of America and Zheng Tao Han of 4 Dongming Road, Zheng Zhou, Hunan, China ( hereinafter jointly referred to as ASSIGNOR" ), and Biosuccess Biotech Co., Ltd, a company organized and existing under the laws of the Cayman Islands, registered at P.O.Box 30592-SMB Cayside, 2nd Floor Harbour Drive, George Town, Grand Cayman, Cayman Islands, B.W.I. having its central operations office located at Room 904, 9th floor, No.147, Sec. 2, Chien-Kuo North Road., Taipei, Taiwan 10460, R.O.C ( hereinafter referred to as "ASSIGNEE").

<u>WITNESSETH:</u>

WHEREAS, ASSIGNOR is the owner of the patents and patent applications as hereinafter defined relating to inter alia the use of phorbol esters for treating patients for neoplastic diseases ( leukemia), for increasing white blood cell counts and for HIV/AIDS;

WHEREAS, ASSIGNOR do hereby assign all my/our rights and interests of under the aforesaid patent applications and patents and the Know-How relating thereto for use in relations treating patients for elevation of white blood cell counts, anti-neoplastic and HIV/AIDS;

WHEREAS, ASSIGNEE wishes to obtain the exclusive license in all Territories of the patents and patent application, for treating patients with phorbol esters for elevation of white blood cell counts, anti-neoplastic and for HIV/AIDS, under said patent applications and patents and the Know-How relating thereto;

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and obligations herein contained, the parties hereto agree as follows:

<u>ARTICLE 1 – Definitions:</u>

1.1 "Know-How" shall mean all technology, formula, trade secrets, technical, toxicological, pharmacological, scientific and/or medical data and any other information or experience ( including, but not limited to , pre-clinical or clinical data), owned, controlled, possessed or received by ASSIGNOR as of the date of execution of this Agreement specifically relating to the Product and which it is at liberty to disclose, including, but not limited to, such data or information which will allow ASSIGNEE to efficiently manufacture, use or sell ASSIGNED Product.

1.2 " ASSIGNED Product" shall mean esters of phorbol, pharmaceutically acceptable acid addition salts thereof and any finished dosage form thereof when

2. T.

RC

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY UNDER THE CONFIDENTIALITY ORDER        BB0016634

manufactured, used, offered for sale or sold or elevation of white blood cell counts, anti-neoplastic ( leukemia ) and HIV/AIDS.

1.3   "Patent Rights" shall mean all of ASSIGNOR's right, title and interest in and to the U.S. Patent No. 6063814 dated 16 May 2000 and patent applications, including AU6968798A1, EP0986378A4, JP2001520656T2 and WO9846218A1, and any division, extension, reissue or reexamination thereof, together with

1.4   "Right of Patent Application" shall mean the new filing of US patent application for HIV/AIDS ( U.S. patent application _____ filed on _____ entitled _____

. And subsequent patent application rights to be filed to other countries other than U.S..

### Articles 2 – Grant:

2.1   ASSIGNOR represents and warrants that it is the owner of the Patent Rights and the Know-How, which does not infringe any patent or other rights of any third party;

2.2   In the event that ASSIGNOR shall obtain a patent on the Know-How, ASSIGNOR shall grant to ASSIGNEE free of charge, consistent with the terms of this Agreement, to practice the Know-How in conjunction with the ASSIGNED Product, and to make, have made, use and sell Assigned Product under such patent.

### Article 3 – Terms & Conditions

3.1   ASSIGNEE agrees to the following basic compensations and incentives:

   a. Total milestone payment: US$2 million is to be paid in the following manners:

     (1) One million US dollar: when the clinical trial phase II for leukemia is completed in the US.

     (2) One million US dollar: when the FDA approves the NDA for leukemia, normally is the time when the clinical trials phase III for leukemia is completed.

   b. Eligible to own 36% of the total ASSOGNEE's stock shares at the time the company is established.

3.2   The ASSIGNEE also agrees the following compensations to be paid to the ASSIGNOR:

   a. Additional Incentives

     A US$1 million dollar is to be granted to the CONSIGNOR after each disease

2, T

R△  -△

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY UNDER THE CONFIDENTIALITY ORDER

BB0016635

indication other than leukemia, if the clinical trial is completed and approved by FDA respectively in the U.S..

b. Consulting fees: At least US$250,000 annually or market compatible compensation to be paid and the CONSIGNOR is required to take on the following company headquarter positions namely, which could be subject to change as company grows and market evolves:

Professor Richard L. Chang – CSO

Professor Zheng Tao Han – CRO & CTO

c. Travel expenses related to conduct consultancy services will be at ASSIGNEE's expenses, complying with ASSIGNEE's travel expenses procedure and policy being set-up.

3.3   ASSIGNEE shall provide ASSIGNOR with detailed and complete written report of the progress and results of the development of the ASSIGNED Product on a semi-annual basis. Additionally, meetings shall be held at least once every three months.

3.4   ASSIGNOR has rights to conduct auditing over ASSIGNEE's accounting statement at least on semi-annual basis with prior notice to ASSIGNEE, which can be done through outside CPA film after coordinating with ASSIGNEE in advance.

## Article 4 – Infringement and Indemnifications:

4.1   The parties shall promptly notify each other of a challenge to the validity or enforceability of the Patent Rights or Know-How. In the event of a lawsuit relating to the validity or enforceability of the Patent Rights or Know-How, ASSIGNEE shall have the opportunity to control the defense thereof on behalf of both parties. ASSIGNOR agrees to cooperate with ASSIGNEE and to execute any documents relating to such action.

4.2   In the event that in the exercise of rights granted under this agreement, ASSIGNEE is threaten with or subject to a suit for infringement of a patent owned by a third party; ASSIGNEE will advise ASSIGNOR and consult in good faith with ASSIGNOR as to whether and how to respond. Subject to reimbursement for its costs, ASSIGNOR shall provide reasonable assistance to ASSIGNEE in the event that either both of them is subject to such suit. ASSIGNOR shall have no obligation to ASSIGNEE with respect to any liability that either or both of them shall incur as a result of any such suit or threat.

4.3   ASSIGNEE agrees that there are no any challenges or procures or assists others in a challenge to the validity of the assigned Patent rights.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY UNDER THE CONFIDENTIALITY ORDER

4.4   ASSIGNEE shall defend, indemnify and hold harmless ASSIGNOR from and against any and all claims, demands losses and expenses of any nature, including attorney's fees, including but not limited to, death, personal injury, illness, property damage or product liability, arising from or in connection with any of the following:

(a) The use by ASSIGNEE or affiliates of any method or process covered by the Patent Rights or disclosed in the Know-How;

(b) Any use, sale or other disposition of Product by ASSIGNEE, or any statement, representation or warranty of ASSIGNEE with respect thereof.

The indemnification set forth herein shall not be applicable in the event that the claim, demand or lawsuit in question arises from the negligence or willful or improper act, of ASSIGNOR.

4.5   The ASSIGNEE shall obtain and maintain in force product liability insurance for any and all countries wherein any Assigned Product shall be manufactured, sold, distributed or advertised and shall name ASSIGNOR as one of the insured.

## Article 5 – Termination:

5.1   The Agreement shall be considered to be completed in terms of assignment of patent right and right of patent application to the ASSIGNEE as soon as the fulfillment of Article 3.1a and 3.1.b by the ASSIGNEE, unless terminated sooner pursuant to the provisions of this Agreement.

5.2   Upon termination under this Article 5.2, if it should occur for any causes, as of the effective date of the termination and, from and after said effective date of termination under Article 4.2, ASSIGNEE shall have no further right to use any Know-How imparted to it by ASSIGNOR hereunder. In the event of such termination, ASSIGNEE shall have no further obligations to ASSIGNOR, except for those set out in Article 4.4 ( which is not terminable ) and to provide ASSIGNOR promptly with all data relating to the Assigned Product in its possession at the date of such termination. ASSIGNOR shall have the right to use such data provided however it chooses, including the right to supply same to a subsequent assignee. In the event that one or more applications for drug investigation or marketing approval has been filed by or granted to ASSIGNEE thereof as of

BB0016637

the date of termination under this Article 5.2, ASSIGNEE shall assign or procure the assignment of such application or approval to ASSIGNOR free of charge.

5.3   In the event of a breach of, of default under, this Agreement by ASSIGNEE is not cured within sixty ( 60 ) days after the receipt of written notice thereof from ASSIGNOR, ASSIGNOR shall be entitled ( without prejudice to any of its other rights) to terminate this Agreement by giving notice to take effect immediately.

5.4   ASSIGNOR shall have the right to terminate this agreement forthwith in the event of ASSIGNEE's filing the bankruptcy.

5.5   The right to terminate this Agreement pursuant to this Article 5 shall not be affected in any way by a waiver of, or failure to take action with respect to, any previous breach or default. Termination of this Agreement shall not affect the rights and/or obligations of the parties accrued prior to termination.

<u>Article 6 – Know-How, Information, Improvements and Confidentially:</u>

6.1   ASSIGNOR agrees that it shall:

a) Disclose to any of the Know-How in its possession or provided to it under this Agreement to the ASSIGNEE without any reservation and

b) take such precautions as it normally takes with its own confidential and proprietary information to prevent disclosure to third parties ( except Affiliates and consultants as above).

6.2   The obligation of ASSIGNOR under Article 5.2 shall not, in any event, apply to any information which it can show:

a) at the time of disclosure is, or thereafter becomes, available to the public in published literature or otherwise through no fault of ASSIGNOR; or

b) was known to, or otherwise in the possession of, ASSIGNEE or Affiliates, or consultants of ASSIGNEE prior to the receipt of such information from ASSIGNOR; or,

c) is obtained by ASSIGNEE from a source other than ASSIGNOR and other than one who would be breaching a commitment or confidentiality to ASSIGNOR by disclosing such information to ASSIGNEE.

<u>Article 7 – Patent Maintenance and Extension:</u>

Z.T

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY UNDER THE CONFIDENTIALITY ORDER     BB0016638

7.1   ASSIGNEE shall bear the cost of obtaining patents on the patent applications set out in Article 1.5 and attends to and bears the cost of maintaining patent rights throughout the life of said rights in USA, and other countries where applicable.

7.2   Whenever it is possible and there is a reasonable prospect of success, ASSIGNEE shall apply for extension of the Patent Rights within any period prescribed for such application. It would be the responsibility of ASSIGNEE to work with its agent with respect to such filing and prosecution of action and agrees to cooperate with said agent in providing any information required under any relevant laws, and any regulations promulgated thereunder. All expenses of such proceedings shall be borne by ASSIGNEE.

7.3   The proprietary right to any improvements and modifications on the patents licensed hereby, including but not limited to patent, copyright, trade secrets and other related rights, shall be vested in ASSIGNEE.

### Article 8 - Publicity

8.1   ASSIGNOR and ASSIGNEE agree not to issue any press release or other public statement disclosing the existence of or relating to this Agreement without the prior written consent of the other party, provided, however, that neither party hereto shall be prevented from complying with any duty of disclosure or it may have pursuant to law.

### Article 9 - Notices:

9.1   Any notice or communication required or permitted to be given or made under this Agreement by one of the parties hereto the other shall be in writing and shall be deemed to have been sufficiently given or made to all purposes when mailed by certified mail, return receipt requested, postage prepaid, addressed to such other party at its respective address as follows:

TO ASSIGNOR:

Attention: Richard L Chang & Zhang Tao Han

TO ASSIGNEE:

Attention: Fred Chi-Ming Wu, Biosuccess Biotech Co., Ltd.

### Article 10 - Force Majeure

Z.T

Re

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY UNDER THE CONFIDENTIALITY ORDER

BB0016639

10.1   Neither party shall be responsible or liable to the other hereunder for failure or delay in performance of this Agreement due to any war, fire, accident or other casualty, or any labor disturbance or act of God or the public enemy, or any other, whether similar or dissimilar to the foregoing, contingency beyond such party's reasonable control. In addition, in the event of the eliminate, cure and overcome any of such causes and resume performance of its obligations as soon as reasonable possible under the circumstances. If either party finds that it is subject to conditions as set out in this article that may delay or preclude its performance of any of its obligations under this agreement it shall promptly advise the other thereof.

### Article 11 – Assignment and Transfer

11.1   Any subsequent applications of phorbol esters for treating patients for other diseases by the ASSIGNOR would be considered to be the rights of the ASSIGNEE. And any subsequent patents and patent applications granted for ASSIGNOR for other diseases or indications would also be considered to the right and interests of and the ownership of the ASSIGNEE.

11.2   Any " Know-How" developed subsequently relating thereafter the Agreements is in effect will also be considered to be the right and interests of ASSIGNEE.

### Article 12 – Severability

12.1   If any one or more of the provisions of this Agreement shall, for any reason be held by any court, tribunal or other authority having jurisdiction over either of the parties hereto or this Agreement, be held to be invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions here shall not in any way be affected or impaired thereby. In the event any provision shall be held invalid, illegal or unenforceable, the parties shall use their best efforts to substitute a valid, legal and enforceable provision, which, insofar as practical, implements the intent of the parties and the purposes hereof.

### Article 13 – Governing Law and Jurisdictions:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY UNDER THE CONFIDENTIALITY ORDER

BB0016640

13.1    This Agreement shall be construed and the rights of the parties governed in accordance with the laws of the state of New Jersey, USA, excluding its rules relating to conflict of laws.

### Article 14 – Entire Agreement:

14.1    This Agreement constitutes the entire understanding of the parties with respect to the subject matter contained herein and may not be modified or amended except as expressly stated herein or by a written agreement duly executed by both parties hereto.

### Article 15 – Miscellaneous Provisions:

15.1    The title of the Article of this Agreement is for general information and reference only and this Agreement shall not be construed by reference to such titles.

15.2    It is expressly agreed that this agreement does not authorize either party to act or hold itself out or be held out as the agent of the other.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in duplicate by their duly authorized representatives as of the day, month and year first above written, each copy of which shall for all purposes be deemed to be an original.

ASSIGNOR: Richard L. Chang          ASSIGNOR: Zheng Tao Han

By: _Richard L Chang_          By: _Zheng Tao Han_

Title: _CSO_   Date: _8/30/06_          Title: _____   Date: _8/30/06_

ASSIGNEE: Biosuccess Biotech Co., Ltd.

By: Name: Fred Chi-Ming Wu   _[signature]_

Title: _Chairman & CEO_   Date: _8/30/2006_

Z.T

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY UNDER THE CONFIDENTIALITY ORDER          BB0016641