LEE TRAN & LIANG LLP
Enoch H. Liang (SBN 212324)
enoch.liang@ltlattorneys.com
Heather F. Auyang (SBN 191776)
heather.auyang@ltlw.com
Lisa J. Chin (SBN 259793)
lisa.chin@ltlattorneys.com
601 S. Figueroa Street, Suite 3900
Los Angeles, CA 90017
Telephone: (213) 612-3737
Facsimile: (213) 612-3773

Attorneys for Defendant and Counterclaimant
Zheng Tao Han

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD L. CHANG, | Case No. 5:14-cv-00426-EJD |
| Plaintiff, | **DEFENDANT AND COUNTERCLAIMANT ZHENG TAO HAN'S FIRST AMENDED COUNTERCLAIMS AGAINST PLAINTIFF AND COUNTERCLAIM DEFENDANT RICHARD L. CHANG** |
| v. | |
| ZHENG TAO HAN, an individual; and CHI-MING WU A/K/A FRED WU, an individual, BIOSUCCESS BIOTECH, CO., LTD., a Cayman Islands Corporation, BIOSUCCESS BIOTECH, CO., LTD., a Nevada Corporation, and DOES 1 through 50, inclusive, | |
| Defendants. | |
| ZHENG TAO HAN, an individual, BIOSUCCESS BIOTECH, CO., LTD., a Cayman Islands Corporation, BIOSUCCESS BIOTECH, CO., LTD, a Nevada Limited Liability Company, | **JURY TRIAL DEMANDED** |
| Counterclaimants, | |
| v. | |
| RICHARD L. CHANG, | |
| Counterclaim Defendant. | |

# FIRST AMENDED COUNTERCLAIMS

Pursuant to Rule 15 of the Federal Rules of Civil Procedure, Defendant and Counterclaimant Dr. Zheng Tao Han ("Defendant" or "Dr. Han") by and through his attorneys, hereby submits his first amended counterclaims against Plaintiff and Counterclaim Defendant Richard L. Chang ("Chang" or "Plaintiff"), as follows:

## PARTIES

1.      Biosuccess Biotech, Co. Ltd. is a corporation organized under the laws of the Cayman Islands ("Biosuccess Cayman"), with its principal place of business in Taiwan at Room 904, 9th Floor, No. 147, Sec. 2, Chien-Kuo North Road, Taipei, Taiwan 10460, R.O.C.

2.      Biosuccess Biotech, Co. Ltd., is a Limited Liability Company registered in the state of Nevada ("Biosuccess Nevada"), with its principal place of business in Taiwan at Room 904, 9th Floor, No. 147, Sec. 2, Chien-Kuo North Road, Taipei, Taiwan 10460, R.O.C.[1]

3.      Dr. Zheng Tao Han ("Dr. Han") is an individual residing in Zhengzhou City, Henan Province, China.

4.      Upon information and belief, Plaintiff Richard L. Chang resides in both the states of New Jersey and California.

## JURISDICTION AND VENUE

5.      This action arises under the patent laws of the United States, 35 U.S.C. Sections 1 et seq., and specifically under 35 U.S.C. Section 256, and under the Federal Declaratory Judgment Statute 28 U.S.C. Sections 2201 and 2202.

6.      There exists an immediate, actual and justiciable controversy between Defendants and Plaintiff within the meaning of 28 U.S.C. Section 2201 as evidenced by Counterclaim Defendant's filing of the Complaint, and Defendants are seeking a declaratory judgment as to the rights and legal relations between the parties.

---

[1] Biosuccess Cayman and Biosuccess Nevada are sometimes referred to collectively as "Biosuccess."

1    7.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

2    Sections 1331 and 1338.

3    8.     This Court also has supplemental jurisdiction over any other claims asserted

4    pursuant to 28 U.S.C. Sections 1367 and 1338(b).

5    9.     In addition, complete diversity exists between the parties, and the amount in

6    controversy exceeds $75,000.  Accordingly, subject matter jurisdiction is also proper in this case

7    under 28 U.S.C. Section 1332.

8    10.    These Counterclaims arises out of the same transaction and/or occurrence described

9    in Plaintiff's Complaint.

10    11.    Counterclaim Defendant has consented to personal jurisdiction for this action in

11    this judicial district by filing his Complaint in this action.

12    12.    Venue over these compulsory counterclaims is proper in this judicial district under

13    28 U.S.C. Section 1391.

14                            **GENERAL ALLEGATIONS**

15    **A.     The Relationship between Dr. Han and Chang and the '814 Patent**

16    13.    For decades, Dr. Han has worked as a well-respected scientist specializing in the

17    use of 12-O-tetradecanoylphorbol-13 acetate, also known as "TPA," to treat a multitude of

18    diseases, including acute myelogenous leukemia ("AML"), AIDS/HIV for patients who were

19    refractory to standard therapy, and stroke.

20    14.    Dr. Han is currently a Senior Researcher, Professor, Director, Laboratory of

21    Medicinal Chemistry and Immunology, of Henan Institute of Cancer Research, located in

22    Zhengzhou City, Henan Province, China.  Dr. Han is also the CSO and CTO of Biosuccess.

23    15.    In or around 1984, Dr. Han first met Plaintiff when he came to the United States;

24    Dr. Han and Plaintiff were colleagues at Hoffman-La Roche.  Dr. Han suggested to Plaintiff the

25    idea of using TPA to treat humans.  Dr. Han also discovered the effect of TPA on late stage

26    leukemia and was responsible for devising all research plans and clinical experiments related to

27    TPA.  Dr. Han's ideas and research are the basis for the subject matter disclosed in U.S. Patent

28

1  No. 6,063,814 (the "'814 Patent"), titled "Phorbol Esters as Anti-Neoplastic and White Blood Cell
2  Elevating Agents."
3      16.    Plaintiff simply provided the translation of Dr. Han's work for the subject matter
4  disclosed in the '814 Patent and devised a plan to add himself as a named inventor to any patent
5  applications.  That plan included taking control of the patent prosecution for any patent
6  applications filed based on Dr. Han's work.
7      17.    As a result, Plaintiff improperly took control and filed U.S. Application No.
8  08/837,085 (the "'085 application") on April 14, 1997.  The '085 application listed both Plaintiff
9  and Dr. Han as named co-inventors.
10     18.    On May 16, 2000, the '814 Patent issued from the '085 application.
11     19.    Dr. Han is currently listed as a named inventor of the '814 Patent.
12     20.    Plaintiff Chang is currently listed as a named inventor of the '814 Patent.
13     21.    Biosuccess is currently listed as the sole assignee of the '814 Patent.
14     22.    In a concurrent proceeding in the Central District of California, Case No. CV13-
15  01340-JAK, Plaintiff was asked to produce evidence that he invented any of the subject matter
16  disclosed in the '814 Patent.  He did not produce any evidence, such as lab notebooks or
17  otherwise.  Hence, Plaintiff lacks any evidence to support his claims that he should be a named
18  inventor.
19     23.    Under 35 U.S.C. Section 256, this Court may order correction of the '814 Patent by
20  ordering the Commissioner of Patents to issue a certificate removing Plaintiff Chang as a named
21  inventor.
22  **B.    Biosuccess is the Leader in TPA Research**
23     24.    Founded in 2005, Biosuccess is a promising biomedical research and development
24  company dedicated to researching 12-O-tetradecanoylphorbol-13 acetate, also known as "TPA,"
25  for the treatment and applications of, *inter alia*, acute myelogenous leukemia ("AML"),
26  AIDS/HIV for patients who were refractory to standard therapy, and stroke.  Biosuccess gave TPA
27  a unique designated name of "PD-616."  Biosuccess's main goals are to supply drugs to the global
28

market and to obtain both domestic and foreign patent protection.

25.     Biosuccess has spent considerable time and effort, as well as millions of dollars towards the research and development of PD-616 for the treatment of AML and stroke, as well as numerous other treatment applications.  Biosuccess has developed and compiled valuable research and business data considered trade secrets, as well as other confidential and proprietary information.  Biosuccess's main research operations are based in China under the supervision of Dr. Han and other research scientists.  Biosuccess uses its confidential, proprietary, and trade-secret information for, among other things, submissions to the U.S. Food and Drug Administration ("FDA"), and as a basis for filing both domestic and foreign patent applications.  Neither Biosuccess's trade secrets nor its confidential and proprietary information are public or generally known.

26.     Biosuccess's trade-secret information is contained in various documents and electronic files.  Biosuccess takes great care to maintain the secrecy of its trade-secret and other confidential and proprietary information, and to prevent their disclosure to persons outside the Company, including requiring employees to sign a non-disclosure agreement and abide by the Employee Handbook.

27.     Based on Biosuccess's trade secret and other confidential and proprietary information, Biosuccess has been involved with two clinical studies.  The first is NCT01009931, titled "Phase II Study of TPA Plus Dexamethasone & CMT in Hematologic Malignancies."  The second is NCT01795924, titled "Safety and Efficacy Study of PD-616 Plus Cytarabine to Treat Acute Myelogenous Leukemia or Myelodysplastic Syndrome (AML/MDS)," which has two trial sites – City of Hope Comprehensive Cancer Center and University of Kentucky Medical Center.

**C.     Plaintiff Richard Chang's Relationship with Biosuccess**

28.     During all relevant times (around August 2006 to January 2013), Plaintiff Chang was a shareholder, officer, employee, and a member of the Board of Directors of Biosuccess. Although Plaintiff Chang did not contribute or participate with respect to Biosuccess's trade-secret and other confidential and proprietary information, he had knowledge and access to all of

Biosuccess's most sensitive information, including years of research data related to PD-616 and its proprietary formulations.

29.     Ben Chang is the son of Richard Chang.  In 2006, Ben Chang became a consultant for Biosuccess.  Ben Chang role was Biosuccess's Chief Finance Officer, Chief Operating Officer and President for the North America operation.  In his role, Ben Chang had knowledge and access to all of Biosuccess's most sensitive information, including years of research data related to PD-616 and its proprietary formulations.

30.     As a condition of their employment, Plaintiff Chang and Ben Chang were all obligated to protect Biosuccess's trade secrets and other confidential and proprietary business information.  For instance, Biosuccess's Employee Handbook provides, in pertinent part, that:

a.     The information protected includes, among other things, "new product research, pending projects and proposals, proprietary production processes, research and development strategies, [and] scientific data."

b.     Employees agreed that they would "only share such information with those individuals who have authorized access with prior written approval, from Biosuccess' Chief Financial Officer."

c.     Employees agreed that upon termination of employment that they must return all Biosuccess property.

31.     In the years 2006, 2008, 2009 and 2010, Plaintiff Chang did not receive a form W-2.

32.     Upon information and belief, Plaintiff Chang received unemployment benefits from the State of New Jersey during the relevant time.

33.     For at least part of the years 2007, 2011 and 2012, Plaintiff Chang received a form W-2.

**D.     The Patent Assignment Agreements**

34.     As a predicate to Plaintiff's employment agreement with Biosuccess, around 2006, Biosuccess entered into negotiations with Dr. Han, and Plaintiff, the named inventors of the '814

1 Patent, to discuss the assignment of all rights, title, and interest of certain patent and patent

2 applications, including the '814 patent.

3      35.      During the negotiations, Plaintiff, who represented Dr. Han at the time, alleged that

4 he and Dr. Han were the owners of the rights, title, and interest of the '814 patent, which relates to

5 the treatment of neoplastic diseases (leukemia). No U.S. patent applications claiming priority to

6 the '814 patent were ever filed or maintained.

7      36.      During the negotiation, Plaintiff also alleged that they were the owners of the

8 rights, title, and interest to certain foreign patent applications, including Australia Patent

9 Application No. 69687/98, European Patent Application Publication No. 0986378, Japanese

10 Patent Application No. 2001-520656, and World Intellectual Property Organization Application

11 Publication No. WO/1998/046218 (collectively "International Patent Applications"), all

12 purportedly relating to the treatment of leukemia. The International Patent Applications claim

13 priority to the '814 Patent.

14      37.      The aforesaid negotiations ultimately led to the signing of an agreement titled,

15 "Assignment of Patent Right & Assignment of Right of Patent Application Agreement," dated

16 October 12, 2006 (referred to herein as "the October 2006 Agreement"). The October 2006

17 Agreement was executed by Dr. Han and Plaintiff, as the assignors, and by Biosuccess, as the

18 assignee. A copy of the October 2006 Agreement is attached as **Exhibit A**.

19      38.      In 2011, the same parties to the October 2006 Agreement executed a *new* version of

20 the assignment agreement (referred to herein as "the Amendment"). The Amendment was

21 purposely back-dated by the parties to August 30, 2006. A copy of the Amendment is attached as

22 **Exhibit B**. The October 2006 Agreement and the Amendment are hereinafter collectively referred

23 to as the "Assignment Agreement."

24      39.      The Amendment, which was executed in 2011, but back-dated to August 2006, is

25 the controlling version of the assignment agreement between the parties. This resulted in novation

26 of the contractual obligations between Dr. Han, Plaintiff and Biosuccess.

27      40.      The terms and conditions of the Amendment were basically the same as the

28

October 2006 Agreement, except for several important differences relating to the timing of payments made to the assignors in Section 3.1(a). [*See* Exh. B at 2].

41. According to the Assignment Agreement, the assignors assigned to Biosuccess all rights, interest and know-how relating to the use of phorbol esters for treating patients for neoplastic diseases (leukemia) and for increasing white blood cell counts under the '814 patent and the International Patent Applications, and for treating HIV/AIDS under pending patent applications. [*See* Exhs. A and B at 1-2, WHEREAS clauses and Sections 1.3 and 1.4]. In consideration of the assignment, Biosuccess agreed to pay to the assignors certain reimbursement, expense and landmark payments, and a total of 36% of the shares of Biosuccess (18% to each assignor). [*See* Exhs. A and B at Sections 3.1 and 3.2].

42. Section 3.2(b) of the October 2006 Agreement required Plaintiff to take the position of Biosuccess's Chief Technology Officer ("CTO") companywide in consideration of a consulting fee of "US$250,000 annually to be paid evenly on quarterly basis." [*See* Exh. A]. Similarly, Section 3.2(b) of the Amendment required Plaintiff to take the position of Biosuccess's Chief Science Officer ("CSO") at its headquarters in consideration of a consulting fee "of at least US$250,000 annually or market compatible compensation." [*See* Exh. B].

**E.    Plaintiff's Representations While Negotiating the October 2006 Agreement**

43. In 2006, during the negotiation of the October 2006 Agreement, Plaintiff intentionally concealed the fact that all of the International Patent Applications had expired, lapsed, or been abandoned due to lack of maintenance, and could not be prosecuted into patents in their respective nations or territories.

44. Plaintiff purposefully took control from Dr. Han and was in charge of the filing and maintenance of the International Patent Applications for the Assignors. Dr. Han was unaware of the true status of the International Patent Applications.

45. During the negotiation of the October 2006 Agreement, Biosuccess relied on Plaintiff's representation of the viability of the International Patent Applications, especially because no further U.S. patent applications could be filed claiming priority to the '814 patent.

1  Plaintiff had a duty to disclose the true status and condition of the International Patent

2  Applications to Biosuccess, as well as to the co-owner of such applications, Dr. Han.

3       46.    Plaintiff failed to disclose material facts concerning the true status of the

4  International Patent Applications, specifically that each such application had expired, lapsed, or

5  been abandoned, and could not be revived or reinstated.  Such facts formed a material part of the

6  basis upon which Biosuccess agreed to pay Plaintiff a substantial amount of money, recognize him

7  as an 18% shareholder of Biosuccess, and promise future payments and fees.  The International

8  Patent Applications bore directly on the value of the intellectual property rights to be assigned at

9  the time of negotiations.

10      47.    Biosuccess would have agreed to less favorable terms and compensation to Plaintiff

11  had it known the actual status of the International Patent Applications.  In essence, no further

12  patent applications could be filed claiming priority to the International Patent Applications, and no

13  patents would ever have issued from the International Patent Applications.

14      48.    Around 2006, Plaintiff recommended that his son, Ben Chang, be appointed as the

15  operating officer of the U.S. Subsidiary, whose job duties included administering and maintaining

16  Biosuccess's patent applications, including the International Patent Applications.  Indeed, Plaintiff

17  Chang states that "[a]t all relevant times, I gave full and express authority to my son Ben Chang to

18  manage the '814 patent and its associated portfolio of actual and potential additional patent rights

19  including for continuation applications, and to act as my authorized agent and on his behalf on all

20  related matters."  [Case No. 2:13-cv-01340-JAK-AN (Central District of California), Dkt. No.

21  109-2, Declaration of Richard Chang].

22      49.    Plaintiff and his son failed to disclose the true status of the International Patent

23  Applications to the Board of Directors and other principals of Biosuccess after the execution of the

24  October 2006 Agreement.  The Board of Directors and other major shareholders of Biosuccess

25  relied upon and entrusted Plaintiff and his son to manage the organization's patent and patent

26  applications.

27      50.    Since the execution of the October 2006 Agreement, Biosuccess has invested

28

millions of dollars to pursue the development of specific treatments and clinical trials related to the '814 Patent with notable success. Phase I and Phase II clinical trials are ongoing and being conducted by the U.S. Subsidiary pursuant to the regulations of the United States Food and Drug Administration.

51. The value of Biosuccess's innovative leukemia treatment has been substantially reduced as a result of the expiration, abandonment, or lapse of the International Patent Applications because Biosuccess cannot obtain the right to exclude others from the use of such treatment in foreign countries.

52. Biosuccess diligently performed its obligations to the Assignors pursuant to the Assignment Agreement, to wit: Biosuccess has paid hundreds of thousands of dollars to Plaintiff; Biosuccess recognized Plaintiff as an 18% shareholder of Biosuccess; Plaintiff was also appointed to Biosuccess's Board of Directors and participated in all important decisions concerning the organization's affairs; and Plaintiff was appointed as the CTO/CSO.

53. Plaintiff, on the other hand, has made no or little contribution to the development of the clinical data, treatment and clinical trials for leukemia, HIV/AIDS or other diseases, and has failed to perform any meaningful work as Biosuccess's CTO and CSO, respectively.

**F. Plaintiff's Egregious and Reckless Actions towards Biosuccess**

54. Around 2012, Plaintiff, with the help of his son Ben Chang, then operating officer of the U.S. Subsidiary, attempted to usurp control of the organization through unethical and outrageous behavior and directly competed with the interests of Biosuccess, including the misappropriation of trade secrets and the unauthorized disclosure and use of other confidential and proprietary business information.

55. Plaintiff Chang engaged in spreading untrue and misleading statements to the employees of the U.S. Subsidiary regarding his control and influence within the organization, and disclosed confidential business information to others, including the company's payroll information.

56. Plaintiff Chang and his son, Ben Chang, made repeated attempts to induce Dr. Han,

who had been faithfully and diligently performing his research duties for Biosuccess pursuant to the Assignment Agreement, to take his research and data and defect with them to outside investors, by offering Dr. Han millions of dollars in return. Dr. Han rejected the Changs' offers.

57. At the knowledge or instruction of Plaintiff, Chang's son registered himself as a managing member of the U.S. Subsidiary without approval by Biosuccess, disseminated false and misleading statements to other employees of the U.S. Subsidiary concerning Plaintiff's power, misappropriated company fund for personal use, and falsified information on documents.

58. In 2012, Biosuccess discovered for the first time that the International Patent Applications had all expired, lapsed or been abandoned before the signing of the October 2006 Agreement and could not be further prosecuted or reinstated.

59. During his employment as Biosuccess's CTO/CSO, Plaintiff accessed and gathered for his own unauthorized purposes most, if not all, of Biosuccess's trade secret and other confidential and proprietary information, including research data related to PD-616 and its proprietary formulations. Plaintiff then misappropriated Biosuccess's trade-secret information and transferred and took its other confidential and proprietary information in violation of his obligations and without Biosuccess's knowledge, permission, or authorization.

60. On information and belief, Plaintiff Chang, his son Ben Chang, and other unknown Doe Defendants conspired together to steal Biosuccess's most sensitive trade secrets and other confidential and proprietary information for their own benefit and against Biosuccess's interests.

61. On or around January 17, 2013, the CEO and Chairman of Biosuccess, Fred Wu, announced a restructuring of the management in response to the breach of fiduciary duties by Plaintiff and his son. Plaintiff's appointment as the CTO/CSO of Biosuccess and his son's employment as the operating officer of the U.S. Subsidiary were terminated as part of the restructuring effort.

62. On January 22, 2013, in retaliation to the organizational restructuring initiated by Mr. Wu, Plaintiff sent Biosuccess a notice of termination of the Assignment Agreement allegedly, in part, by reason of Biosuccess's breach of the payment obligations under the Assignment

Agreement.

63.     Dr. Han did not participate in any of Plaintiff's misconduct or in Plaintiff's notice of termination.  In fact, Dr. Han has maintained, and continues to maintain, that the Assignment Agreement is still valid and enforceable.

**G.     Plaintiff Conspired to Form a Competing Company**

64.     In furtherance of the conspiracy and plan to destroy Biosuccess, Plaintiff planned and did in fact use the stolen information from Biosuccess that he had impermissibly retained after his termination in order to start a competing company.

65.     On information and belief Plaintiff approached and brought in Nepia.  On or around July 18, 2013, according to Nepia's S.E.C. filings, Nepia entered into a Memorandum of Understanding and Asset Assignment Agreement with third parties Imagic, LLC dba Rich Pharmaceuticals and Richard L Chang Holdings, LLC to acquire certain alleged assets including the '814 Patent and all related intellectual property associated with the patent.  Upon information and belief, Imagic, LLC is controlled by Ben Chang.  Richard L Chang Holdings, LLC is controlled by Richard Chang.  According to the SEC filings, cash and stock were exchanged in return.

66.     On July 18, 2013, Nepia appointed Ben Chang as its President, Chief Executive Officer, Chief Financial Officer, Secretary, Treasurer and Director.

67.     Nepia represented in its S.E.C. filings that "[u]nder the direction of our newly appointed officer and director . . . we intend to pursue the development of PD-616 (12-O-tetradecanoylphorbol-13-acetate) for the treatment of: Acute Myelogenous Leukemia ("AML") and Stroke (for the treatment of loss of function cause by Stroke) . . . . "

68.     Nepia stated in its S.E.C. filings that "The priority drug development efforts of the Company are focused on the use of PD-616, a naturally occurring compound that has a number of properties that are uniquely suited for the treatment of patients with Acute Myelocytic Leukemia (AML).  Company scientists had worked with PD-616 in the laboratory for many years studying its ability to convert cancer cells to normal cells, a process called differentiation.  It was also

observed in some instances to cause cancer cell death. These observations were the basis of the proposal to test PD-616 in relapsed AML patients in China and later in the US and resulted in findings that were sufficiently encouraging to support further interest in this drug to treat."

69. In fact, Nepia had performed none of the drug development or work stated in the aforesaid S.E.C. filings. Instead, the drug development and clinical work involving PD-616 and its treatment of AML was a result of work funded and performed by Biosuccess. PD-616 is the unique name created by Biosuccess for the new drug and is Biosuccess's proprietary property.

70. On or around August 12, 2013, Plaintiff recorded with the U.S. Patent and Trademark Office an assignment of the '814 Patent and United States Patent Application Nos. 13/745,745 (the "'745 patent application") and 13/745,740 (the "'740 patent application") to Richard L. Chang Holdings. The contact person and correspondence address for the assignment is his son, Ben Chang, 312 North Mansfield Avenue, Los Angeles, California 90036. Plaintiff also appointed a Power of Attorney to Ben Chang.

71. However in 2006, Plaintiff had already assigned all his rights under the '814 Patent to Biosuccess by an agreement titled, "Assignment of Patent Right & Assignment of Right of Patent Application Agreement." Said assignment agreement was first recorded on November 14, 2006. That assignment is the subject of the pending litigation in the Central District of California, Case No. CV13-01340-JAK.

72. Plaintiff is no longer a named inventor on the '745 patent application or the '740 patent application. Hence, Plaintiff's attempts to assign the patent applications are invalid or void.

73. In July 2013, at least Rich Pharmaceuticals and Ben Chang contacted WuXi AppTec Co., Ltd. ("WuXi") to manufacture TPA. WuXi is the same company that manufactured PD-616 for Biosuccess. Rich Pharmaceuticals used the trade secret and confidential information learned and taken from Biosuccess to facilitate the manufacturing of TPA for their own use. Both Plaintiff and his son Ben Chang participated in the process, along with David Chou, a former Biosuccess employee and key contact person with WuXi.

74. On or around September 3, 2013, Nepia officially changed its name to Rich

Pharmaceuticals, Inc. (although the Changs were already using the Rich Pharmaceuticals entity name).

75.     In late 2013, Plaintiff, his son Ben Chang and Rich Pharmaceuticals engaged a third party Contract Research Organization, Theragene dba Therinova Development ("Theragene").  Therinova was to provide "regulatory support to include the development of the US FDA IND Submission Package for Rich Pharmaceuticals's product PD-616."  The contact person at Theragene was its CEO Jon Berglin.

76.     Therinova's "deliverables" included "Prior data and documentation review:  [] Therinova will review all prior regulatory documentation, research data, and manufacturing information provided by Rich Pharmaceuticals."

77.     Therinova's scope of work was based on the following assumptions: "At the start of this project, the Company will provide to Therinova the following information: 1. Copy of all Regulatory Correspondence and documentation.  2. All Data pertaining to the pre-clinical and clinical development of PD-616.  3.  All information pertaining to the manufacture of PD-616.  4. All additional information needed directly for the US FDA IND Submission."

78.     As John Berglin attested to, Plaintiff and Ben Chang did in fact provide numerous confidential Biosuccess documents that they had unlawfully retained to Therinova.   The Declaration of John Berglin is attached as **Exhibit C**.

79.     Plaintiff Chang and his son Ben Chang were instrumental in the creation of Rich Pharmaceuticals, a company in direct competition with Biosuccess.

80.     Plaintiff Chang and his son Ben Chang intentionally took Biosuccess documents and added the Rich Pharmaceuticals' logo, as well as language stating that Rich Pharmaceuticals was in partnership or working with Biosuccess, in order to benefit from the work of Biosuccess. All of which was untrue or inaccurate.  The curriculum vitae of both Plaintiff Chang and Ben Chang, as well as the Rich Pharmaceuticals website state that Plaintiff Chang and Ben Chang worked for Biosuccess.  Thus, a third party would have no reason <u>not</u> to believe these misleading and inaccurate representations by Plaintiff or Ben Chang.

1         81.    Plaintiff Chang serves as the Chief Scientific Officer and on the Board of Rich

2 Pharmaceuticals.

3         82.    Rich Pharmaceuticals is a publically traded company under the symbol RCHA.

4 **COUNT I**

5 **(Correction of Inventorship)**

6 **(By Dr. Han against Plaintiff Richard Chang)**

7         83.    Defendant incorporates the paragraphs above of his Counterclaims as if fully set

8 forth herein.

9         84.    Dr. Han made independent and material contributions to the conception and

10 reduction to practice of significant features of the invention(s) disclosed and claimed in the '814

11 Patent.

12         85.    Dr. Han is the true and sole inventor of the invention(s) disclosed and claimed in

13 the '814 Patent.

14         86.    Plaintiff made no independent or material contributions to the conception and

15 reduction to practice of the invention(s) disclosed and claimed in the '814 Patent.

16         87.    Plaintiff violated 37 CFR Section 1.56 by signing an oath or declaration attesting

17 that he should be named as an inventor on the '085 application that led to the '814 Patent.

18         88.    As a result of Plaintiff's actions, Defendant has been and will continue to be

19 substantially and irreparably harmed and damaged by the erroneous inventorship, unless the error

20 in inventorship is corrected.

21         89.    Pursuant to 35 U.S.C. Section 256, Defendant seeks a certificate of correction

22 removing Chang as a named inventor of the '814 Patent.

23 **COUNT II**

24 **(Negligent Mismanagement)**

25 **(By Dr. Han against Plaintiff Richard Chang)**

26         90.    Defendant incorporates the paragraphs above of his Counterclaims as if fully set

27 forth herein.

28

91. Plaintiff had a duty to keep Dr. Han informed concerning the status of the '814 Patent and the International Patent Applications (collectively the "'814 Patent Portfolio"). As a co-owner, Dr. Han relied upon and entrusted Plaintiff Chang to manage these patent rights.

92. Plaintiff Chang breach his duty by failing to disclose and inform Dr. Han concerning the status of the '814 Patent Portfolio.

93. Plaintiff appointed his son Ben Chang as his agent to manage the '814 Patent Portfolio. Thus, Ben Chang had the same duty to keep Dr. Han informed concerning the status of the '814 Patent Portfolio.

94. Ben Chang breached his duty by failing to disclose and inform Dr. Han concerning the status of the '814 Patent Portfolio.

95. In 2012, Dr. Han discovered for the first time that the International Patent Applications had all expired, lapsed or been abandoned and could not be further prosecuted or reinstated. Plaintiff and his son Ben Chang's failure to maintain any of the International Patent Applications substantially diminished the value of the intellectual property that is owned by Dr. Han.

96. Plaintiff and his son Ben Chang's failure to file any further U.S. patent applications that claimed priority to the '814 Patent substantially diminished the value of the intellectual property that is Dr. Han.

97. As a direct and proximate cause of Plaintiff Chang and his son Ben Chang's actions (or lack thereof), they substantially diminished the value of the intellectual property rightfully owned solely by Dr. Han as the only inventor.

98. Dr. Han has suffered and will continue to suffer substantial damages as a result of Plaintiff Chang and his son Ben Chang's negligent mismanagement in connection with the exploitation of the intellectual property rights of the '814 Patent Portfolio.

99. Dr. Han has been damaged in an amount to be determined at trial.

## COUNT III

### (Fraud)

**(By Dr. Han against Plaintiff Richard Chang)**

100.     Defendant incorporates the paragraphs above of his Counterclaims as if fully set forth herein.

101.     Plaintiff Chang and his son Ben Chang, acting as Plaintiff's agent, knowingly misrepresented and concealed the true status of the International Patent Applications from Dr. Han, including during negotiations of the October 2006 Agreement, and continued to conceal the true status of the International Patent Applications after execution of the October 2006 Agreement. Specifically, Plaintiff Chang and Ben Chang concealed the fact that no further patent applications could be filed claiming priority to the International Patent Applications, and no patents would have ever issued from the International Patent Applications because the International Patent Applications had expired, lapsed or been abandoned and could not be reinstated.

102.     Plaintiff Chang and Ben Chang concealed these omissions in order to deceive Dr. Han into believing he still had viable patent applications for enforcement outside the United States.

103.     The representations made by Plaintiff Chang and Ben Chang were made with knowledge that they were false, conscious ignorance of the truth, or recklessness as to whether the representations were true or false.

104.     The representations made by Plaintiff Chang were made with the intent of misleading Dr. Han into relying on them and with the intent of inducing Dr. Han to execute the October 2006 Agreement on terms more favorable than would have otherwise occurred.

105.     Dr. Han relied on the above-described fraudulent misrepresentations made by Plaintiff Chang and Ben Chang. His reliance was justifiable in that Dr. Han had known Plaintiff Chang for decades.

106.     Dr. Han has sustained irrevocable damages in that his innovative treatment of leukemia cannot be properly protected outside the United States.

107.     The above-described damages suffered by Dr. Han are the proximate result of Plaintiff Chang's above-described fraudulent material misrepresentations and Dr. Han's justifiable

reliance thereon; and, Dr. Han has been damaged in an amount to be determined at trial.

## COUNT IV

### (Negligent Misrepresentation)

### (By Dr. Han against Plaintiff Richard Chang)

108.    Defendant incorporates the paragraphs above of his Counterclaims as if fully set forth herein.

109.    Plaintiff Chang and Ben Chang made the above-described misrepresentation of material facts with respect to the '814 Patent Portfolio.

110.    Plaintiff Chang and Ben Chang made the misrepresentations under circumstances in which they had a duty to know and to disclose their falsity.

111.    Plaintiff Chang and Ben Chang made the misrepresentations with reckless disregard which Dr. Han relied upon in his belief that Plaintiff Chang and Ben Chang were fulfilling their duties to maintain the '814 Patent Portfolio.

112.    Plaintiff Chang and Ben Chang's misrepresentations resulted in injury to Dr. Han who acted in justifiable reliance on the misrepresentations.

113.    The above-described damages suffered by Dr. Han are the proximate result of Plaintiff Chang and Ben Chang's above-described wrongful conduct and Dr. Han's justifiable reliance thereon; and, Dr. Han has been damaged in an amount to be determined at trial.

## DEFENDANTS' PRAYER FOR RELIEF

WHEREFORE, Defendants pray for the following relief:

A.    That the Court enter judgment in favor of Defendant and against Chang;

B.    That the Court dismiss Chang's Complaint with prejudice;

C.    That the Court declare that Dr. Han is the sole inventor of the '814 Patent and any subject matter arising from the inventions disclosed or claimed;

D.    That the Court issue an order pursuant to 35 U.S.C. Section 256, requiring the Director of the United States Patent and Trademark Office to correct inventorship of the '814 Patent;

E.     For restoration of Dr. Han's ownership and economic interest in and to the '814 Patent;

F.     For general, specific, and consequential damages according to proof at trial;

G.     For exemplary and punitive damages in a sum according to proof at trial;

H.     For the costs of suit and reasonable attorneys' fees; and

I.     For any other and further relief as the Court deems just and proper in this case.

## DEMAND FOR A JURY TRIAL

Defendant and Counterclaimant hereby demand a jury trial on all issues so triable.

Dated: May 29, 2014                    **LEE TRAN & LIANG LLP**


By:   _/s/ Enoch H. Liang_
        Enoch H. Liang
Attorneys for Defendant and Counterclaimant
Zheng Tao Han

**HAN'S FIRST AMENDED COUNTERCLAIMS AGAINST CHANG**
**Case No. 5:14-cv-00426-EJD**



**EXHIBIT  A**

## ASSIGNMENT OF PATENT RIGHT & ASSIGNMENT OF RIGHT OF PATENT APPLICATION
## AGREEMENT

AGREEMENT made this        day of        , 2006, by and between Richard L. Chang of 107 Konner Ave. Pine Brook, New Jersey, United States of America and Zheng Tao Han of 4 Dongming Road, Zheng Zhou, Hunan, China (hereinafter jointly referred to as "ASSIGNOR "), and Biosuccess Biotech Co., Ltd., a company organized and existing under the laws of the Cayman Islands, registered at P.O.Box 30592-SMB Cayside, 2nd Floor Harbour Drive, George Town, Grand Cayman, Cayman Islands, B.W.I., having its central operations office located at 7F-1, No. 577, Lin-Shen North Road., Taipei, Taiwan 10460, R.O.C. (hereinafter referred to as "ASSIGNEE").

### WITNESSETH:

WHEREAS, ASSIGNOR is the owner of the patents and patent applications as hereinafter defined relating to inter alia the use of phorbol esters for treating patients for neoplastic diseases ( leukemia ), for increasing white blood cell counts and for HIV/AIDS;

WHEREAS, ASSIGNOR do hereby assign all my/our rights and interests of  , under the aforesaid patent applications and patents and the Know-How relating thereto for use in relation treating patients for elevation of white blood cell counts, anti-neoplastic and HIV/AIDS;

WHEREAS, ASSIGNEE wishes to obtain the assignment of the patents and patent applications, for treating patients with phorbol esters for elevation of white blood cell counts, anti-neoplastic and for HIV/AIDS, under said patent applications and patents and the Know-How relating thereto;

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and obligations herein contained, the parties hereto agree as follows:

### ARTICLE 1 - Definitions:

1.1         "Know-How" shall mean all technology, formula, trade secrets, technical, toxicological, pharmacological, scientific and/or medical data and any other information or experience (including, but not limited to, preclinical or clinical data), owned, controlled, possessed or received by ASSIGNOR as of the date of execution of this Agreement specifically

ZTH     RLC

relating to the Product and which it is at liberty to disclose, including, but not limited to, such data or information which will allow ASSIGNEE to efficiently manufacture, use or sell Assigned Product.

1.2        "Assigned Product" shall mean esters of phorbol, pharmaceutically acceptable acid addition salts thereof and any finished dosage form thereof when manufactured, used, offered for sale or sold for elevation of white blood cell counts, anti-neoplastic. ( leukemia ) and HIV/AIDS..

1.3        "Patent Rights" shall mean all of ASSIGNOR's right, title and interest in and to the U.S. Patent No. 6063814 dated 16 May 2000 and patent applications, including AU6968798A1, EP0986378A1, EP0986378A4, JP2001520656T2, and WO9846218A1, and any division, extension, reissue or reexamination thereof, together with

1.4        "Right of Patent Application" shall mean the new filing of US patent application for HIV/AIDS ( U.S. patent application No. _____ filed on _____ entitled _____.

And subsequent patent application rights to be filed to other countries other than U.S..

### ARTICLE 2 – Grant:

2.1        ASSIGNOR represents and warrants that it is the owner of the Patent Rights and the Know-How, which does not infringe any patent or other rights of any third party.

2.2        In the event that ASSIGNOR shall obtain a patent on the Know-How, ASSIGNOR shall grant to ASSIGNEE free of charge, consistent with the terms of this Agreement, to practice the Know-How in conjunction with the Licensed Product, and to make, have made, use and sell Assinged Product under such patent.

### ARTICLE 3 – Terms & Conditions

3.1        ASSIGNEE agrees to the following expenditures:

     a. Total payment: US$2 million to be paid in the following manners:

         (1) One million US Dollar - Reimbursement of Efforts and Expenses Spent over the years on TPA research and development is to be paid at the time of singing agreement and having all signed necessary patent documents ready for assignment to the

- 2 -

$z \tau 4$

RLC

ASSIGNEE

(2) One million US Dollar is to be paid by 2/28/2007 –

    (a) 50% of which is for the patent right as described in Article 1.3 ;

    (b) 50% of which is for the patent application right as described in Article 1.4

b. Total company shares to own: 36% of the total ASSIGNEE's shares, which is guaranteed to be maintained as is without being affected due to dilution of any kind up to the stage of company's Pre-IPO.

3.2    The CONSIGNEE also agrees to the following overhead expenses:

    a.  Incentives

        A US$1 million dollar to be granted to the CONSIGNOR after each ( disease indication ) of the clinical trial entering into the phase III stage respectively in the U.S..

    b.  Consulting fees: US$250,000 annually to be paid evenly on quarterly basis and the CONSIGNOR is required to take on the following positions namely, which could be subject to change as company grows:

        Professor Richard L. Chang – CTO, companywide

        Professor Zheng Tao Han – VP, R&D China

    c.  Travel expenses related to conduct consultancy services will be at ASSIGNEE's expenses, complying with ASSIGNEE's travel expenses procedure & policy to be set-up.

3.3    ASSIGNEE shall provide ASSIGNOR with detailed and complete written report of the progress and results of the development of the Assigned Product on a semi-annual basis. Additionally, meetings shall be held at least once every three months.

3.4    ASSIGNOR has rights to conduct auditing over ASSIGNEE's accounting statement at least on semi-annual basis with prior notice to ASSIGNEE, which can be done through outside CPA film after coordinating with ASSIGNEE in advance.

**ARTICLE 4 - Infringement and Indemnifications:**

4.1    The parties shall promptly notify each other of a challenge to the

ZTH

RLC

validity or enforceability of the Patent Rights or Know-How, ASSIGNEE shall have the opportunity to control the defense thereof on behalf of both parties. ASSIGNOR agrees to cooperate with ASSIGNEE and to execute any documents relating to such action.

4.2 In the event that in the exercise of rights granted under this agreement, ASSIGNEE is threatened with or subject to a suit for infringement of a patent owned by a third party, ASSIGNEE will advise ASSIGNOR and consult in good faith with ASSIGNOR as to whether and how to respond. Subject to reimbursement for its costs, ASSIGNOR shall provide reasonable assistance to ASSIGNEE in the event that either both of them is subject to such suit. ASSIGNOR shall have no obligation to ASSIGNEE with respect to any liability that either or both of them shall incur as a result of any such suit or threat.

4.3 ASSIGNEE agrees that there are no any challenges or procures or assists others in a challenge to the validity of the assigned Patent Rights.

4.4 ASSIGNEE shall defend, indemnify and hold harmless ASSIGNOR from and against any and all claims, demands, losses and expenses of any nature, including attorneys' fees, including but not limited to, death, personal injury, illness, property damage or products liability, arising from or in connection with any of the following:

      (a) the use by ASSIGNEE or Affiliates of any method or process covered by the Patent Rights or disclosed in the Know-How;

      (b) any use, sale or other disposition of Product by ASSIGNEE, or any statement, representation or warranty of ASSIGNEE with respect thereof.

The indemnification set forth herein shall not be applicable in the event that the claim, demand or lawsuit in question arises from the negligence, or willful or improper act, of ASSIGNOR.

4.5 The ASSIGNEE shall obtain and maintain in force product liability insurance for any and all countries wherein any Assigned Product shall be manufactured, sold, distributed or advertised and shall name ASSIGNOR as one of the insureds or additional insureds where appropriate.

## ARTICLE 5 - Term/Termination:

5.1 The Agreement shall be considered to be completed in terms of

ZTH

- 4 -

RLC

5.1     The Agreement shall be considered to be completed in terms of assignment of patent right and right of patent application to the ASSIGNEE as soon as the fulfillment of Article 3.1.a and 3.1.b by the ASSIGNEE, unless terminated sooner pursuant to the provisions of this Agreement.

5.2     Upon termination under this Article 5.2, if it should occur for any causes, as of the effective date of the termination and, from and after said effective date of termination under this Article 4.2, ASSIGNEE shall have no further right to use any Know-How imparted to it by ASSIGNOR hereunder.     In the event of such termination, ASSIGNEE shall have no further obligations to ASSIGNOR, except for those set out in Articles 4.4 (which is not terminable) and to provide ASSIGNOR promptly with all data relating to the Assigned Product in its possession at the date of such termination. ASSIGNOR shall have the right to use such data provided however it chooses, including the right to supply same to a subsequent assignee.   In the event that one or more applications for drug investigation or marketing approval has been filed by or granted to ASSIGNEE thereof as of the date of termination under this Article 5.2, ASSIGNEE shall assign or procure the assignment of such application or approval to ASSIGNOR free of charge.

5.3     In the event of a breach of, or default under, this Agreement by ASSIGNEE is not cured within sixty (60) days after the receipt of written notice thereof from ASSIGNOR, ASSIGNOR shall be entitled (without prejudice to any of its other rights) to terminate this Agreement by giving notice to take effect immediately.

5.4     ASSIGNOR shall have the right to terminate this agreement forthwith in the event of ASSIGNEE's filing the bankruptcy.

5.5     The right to terminate this Agreement pursuant to this Article 5 shall not be affected in any way by a waiver of, or failure to take action with respect to, any previous breach or default.   Termination of this Agreement shall not affect the rights and/or obligations of the parties accrued prior to termination.


### ARTICLE 6 - Know-How, Information, Improvements and Confidentiality:


6.1     ASSIGNOR agrees that it shall:

a)     disclose to any of the Know-How in its possession or provided to it under this Agreement to the ASSIGNEE without any reservation and,   b)     take such precautions as it normally takes with its own confidential and proprietary information to prevent disclosure to third parties (except Affiliates and consultants as above).

ZTH

RLC

- 5 -

6.2     The obligation of ASSIGNOR under Article 5.2 shall not, in any event, apply to any information which it can show:

a)     at the time of disclosure is, or thereafter becomes, available to the public in published literature or otherwise through no fault of ASSIGNOR; or

b)     was known to, or otherwise in the possession of, ASSIGNEE or Affiliates, or consultants of ASSIGNEE prior to the receipt of such information from ASSIGNOR ; or,

c)     is obtained by ASSIGNEE from a source other than ASSIGNOR and other than one who would be breaching a commitment of confidentiality to ASSIGNOR by disclosing such information to ASSIGNEE.

### ARTICLE 7 - Patent Maintenance and Extension:

7.1     ASSIGNEE shall bear the cost of obtaining patents on the patent applications set out in Article 1.5 and attends to and bears the cost of maintaining patent rights throughout the life of said rights in USA, and other countries where applicable.

7.2     Whenever it is possible and there is a reasonable prospect of success, ASSIGNEE shall apply for extension of the Patent Rights within any period prescribed for such application. It would be the responsibility of ASSIGNEE to work with its agent with respect to such filing and prosecution of action and agrees to cooperate with said agent in providing any information required under any relevant laws, and any regulations promulgated thereunder. All expenses of such proceedings shall be borne by ASSIGNEE.

7.3     The proprietary rights to any improvements and modifications on the patents licensed hereby, including but not limited to patent, copyright, trade secrets and other related rights, shall be vested in ASSIGNEE.

### ARTICLE 8 - Publicity:

8.1     ASSIGNOR and ASSIGNEE agree NOT to issue any press release or other public statement disclosing the existence of or relating to this Agreement without the prior written consent of the other party, provided, however, that neither party hereto shall be prevented from complying with any duty of disclosure he or it may have pursuant to law.

### ARTICLE 9 - Notices:

9.1     Any notice or communication required or permitted to be given or made under this Agreement by one of the parties hereto to the other shall be in writing and shall be

*ZTH*

*RLC*

deemed to have been sufficiently given or made for all purposes when mailed by certified mail, return receipt requested, postage prepaid, addressed to such other party at its respective address as follows:

> To ASSIGNOR :
> Attention:   Richard L. Chang & Zheng Tao Han
>
> To ASSIGNEE :
> Attention:   Fred Chi-Ming Wu, Biosuccess Biotech Co. Ltd

### ARTICLE 10 - Force Majeure:

10.1   Neither party shall be responsible or liable to the other hereunder for failure or delay in performance of this Agreement due to any war, fire, accident or other casualty, or any labor disturbance or act of God or the public enemy, or any other, whether similar or dissimilar to the foregoing, contingency beyond such party's reasonable control.   In addition, in the event of the applicability of this Article, the party failing or delaying performance shall use its best efforts to eliminate, cure and overcome any of such causes and resume performance of its obligations as soon as reasonably possible under the circumstances.   If either party finds that it is subject to conditions as set out in this article that may delay or preclude its performance of any of its obligations under this agreement it shall promptly advise the other thereof.

### ARTICLE 11 – Assignment and Transfer:

11.1   Any subsequent applications of phorbol esters for treating patients for other diseases by the ASSIGNOR would be considered to be the rights of the ASSIGNEE. And any subsequent patents and patent applications granted for the ASSIGNOR for other diseases or indications would also be considered to the right and interests of and the ownership of the ASSIGNEE.

11.2   Any "Know-How" developed subsequently relating thereafter the Agreement is in effect will also be considered to be the right and interests of ASSIGNEE.

### ARTICLE 12 - Severability:

$ZTH$

$RLC$

- 7 -

12.1 If any one or more of the provisions of this Agreement shall, for any reason be held by any court, tribunal or other authority having jurisdiction over either of the parties hereto or this Agreement, be held to be invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions here shall not in any way be affected or impaired thereby. In the event any provision shall be held invalid, illegal or unenforceable, the parties shall use their best efforts to substitute a valid, legal and enforceable provision, which, insofar as practical, implements the intent of the parties and the purposes hereof.

### ARTICLE 13 - Governing Law and Jurisdiction:

13.1 This Agreement shall be construed and the rights of the parties governed in accordance with the laws of the state of New Jersey, U.S.A., excluding its rules relating to conflict of laws.

### ARTICLE 14 - Entire Agreement:

14.1 This Agreement constitutes the entire understanding of the parties with respect to the subject matter contained herein and may not be modified or amended except as expressly stated herein or by a written agreement duly executed by both parties hereto.

### ARTICLE 15 - Miscellaneous Provisions:

15.1 The titles of the Article of this Agreement are for general information and reference only and this Agreement shall not be construed by reference to such titles.

15.2 It is expressly agreed that this agreement does not authorize either party to act or hold itself out or be held out as the agent of the other.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in duplicate by their duly authorized representatives as of the day, month and year first above written, each copy of which shall for all purposes be deemed to be an original.

ASSIGNOR:  Richard L. Chang          ASSIGNOR:  Zheng Tao Han

By: _Richard L Chang_          By : _Zheng Tao Han_

- 8 -

Name: Richard L Chang          Name : Zheng Tao Han
Title:        CTO               Title:
Date:     10 - 12 - 2006        Date : 10 - 12 - 2006

**ASSIGNEE: Biosuccess Biotech Co., Ltd.**

By:
Name:     Fred C. M. Wu
Title:     Chairman
Date:     10-12-2006

- 9 -

RLC                    ZTH

# EXHIBIT  B

**Assignment of Patent Right & Assignment of Right of Patent Application Agreement**

Agreement was made this 30th day of August, 2006, by and between Richard L. Chang of 107 Konner Ave. Pine Brook, New Jersey, United States of America and Zheng Tao Han of 4 Dongming Road, Zheng Zhou, Hunan, China ( hereinafter jointly referred to as ASSIGNOR" ), and Biosuccess Biotech Co., Ltd, a company organized and existing under the laws of the Cayman Islands, registered at P.O.Box 30592-SMB Cayside, 2nd Floor Harbour Drive, George Town, Grand Cayman, Cayman Islands, B.W.I. having its central operations office located at Room 904, 9th floor, No.147, Sec. 2, Chien-Kuo North Road., Taipei, Taiwan 10460, R.O.C ( hereinafter referred to as "ASSIGNEE").

WITNESSETH:

WHEREAS, ASSIGNOR is the owner of the patents and patent applications as hereinafter defined relating to inter alia the use of phorbol esters for treating patients for neoplastic diseases ( leukemia), for increasing white blood cell counts and for HIV/AIDS;

WHEREAS, ASSIGNOR do hereby assign all my/our rights and interests of under the aforesaid patent applications and patents and the Know-How relating thereto for use in relations treating patients for elevation of white blood cell counts, anti-neoplastic and HIV/AIDS;

WHEREAS, ASSIGNEE wishes to obtain the exclusive license in all Territories of the patents and patent application, for treating patients with phorbol esters for elevation of white blood cell counts, anti-neoplastic and for HIV/AIDS, under said patent applications and patents and the Know-How relating thereto;

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and obligations herein contained, the parties hereto agree as follows:

ARTICLE 1 – Definitions:

1.1    "Know-How" shall mean all technology, formula, trade secrets, technical, toxicological, pharmacological, scientific and/or medical data and any other information or experience ( including, but not limited to , pre-clinical or clinical data), owned, controlled, possessed or received by ASSIGNOR as of the date of execution of this Agreement specifically relating to the Product and which it is at liberty to disclose, including, but not limited to, such data or information which will allow ASSIGNEE to efficiently manufacture, use or sell ASSIGNED Product.

1.2    " ASSIGNED Product" shall mean esters of phorbol, pharmaceutically acceptable acid addition salts thereof and any finished dosage form thereof when

Z. 韩. H:

Ke

manufactured, used, offered for sale or sold or elevation of white blood cell counts, anti-neoplastic ( leukemia ) and HIV/AIDS.

1.3    "Patent Rights" shall mean all of ASSIGNOR's right, title and interest in and to the U.S. Patent No. 6063814 dated 16 May 2000 and patent applications, including AU6968798A1, EP0986378A4, JP2001520656T2 and WO9846218A1, and any division, extension, reissue or reexamination thereof, together with

1.4    "Right of Patent Application" shall mean the new filing of US patent application for HIV/AIDS ( U.S. patent application _____ filed on _____ entitled _____
. And subsequent patent application rights to be filed to other countries other than U.S..

### Articles 2 – Grant:

2.1    ASSIGNOR represents and warrants that it is the owner of the Patent Rights and the Know-How, which does not infringe any patent or other rights of any third party;

2.2    In the event that ASSIGNOR shall obtain a patent on the Know-How, ASSIGNOR shall grant to ASSIGNEE free of charge, consistent with the terms of this Agreement, to practice the Know-How in conjunction with the ASSIGNED Product, and to make, have made, use and sell Assigned Product under such patent.

### Article 3 – Terms & Conditions

3.1    ASSIGNEE agrees to the following basic compensations and incentives:
    a. Total milestone payment: US$2 million is to be paid in the following manners:
        (1) One million US dollar: when the clinical trial phase II for leukemia is completed in the US.
        (2) One million US dollar: when the FDA approves the NDA for leukemia, normally is the time when the clinical trials phase III for leukemia is completed.
    b. Eligible to own 36% of the total ASSOGNEE's stock shares at the time the company is established.

3.2    The ASSIGNEE also agrees the following compensations to be paid to the ASSIGNOR:
    a. Additional Incentives
        A US$1 million dollar is to be granted to the CONSIGNOR after each disease

2 . 7

indication other than leukemia, if the clinical trial is completed and approved by FDA respectively in the U.S..

    b. Consulting fees: At least US$250,000 annually or market compatible compensation to be paid and the CONSIGNOR is required to take on the following company headquarter positions namely, which could be subject to change as company grows and market evolves:

        Professor Richard L. Chang – CSO

        Professor Zheng Tao Han – CRO & CTO

    c. Travel expenses related to conduct consultancy services will be at ASSIGNEE's expenses, complying with ASSIGNEE's travel expenses procedure and policy being set-up.

3.3    ASSIGNEE shall provide ASSIGNOR with detailed and complete written report of the progress and results of the development of the ASSIGNED Product on a semi-annual basis. Additionally, meetings shall be held at least once every three months.

3.4    ASSIGNOR has rights to conduct auditing over ASSIGNEE's accounting statement at least on semi-annual basis with prior notice to ASSIGNEE, which can be done through outside CPA film after coordinating with ASSIGNEE in advance.

## Article 4 – Infringement and Indemnifications:

4.1    The parties shall promptly notify each other of a challenge to the validity or enforceability of the Patent Rights or Know-How. In the event of a lawsuit relating to the validity or enforceability of the Patent Rights or Know-How, ASSIGNEE shall have the opportunity to control the defense thereof on behalf of both parties. ASSIGNOR agrees to cooperate with ASSIGNEE and to execute any documents relating to such action.

4.2    In the event that in the exercise of rights granted under this agreement, ASSIGNEE is threaten with or subject to a suit for infringement of a patent owned by a third party; ASSIGNEE will advise ASSIGNOR and consult in good faith with ASSIGNOR as to whether and how to respond. Subject to reimbursement for its costs, ASSIGNOR shall provide reasonable assistance to ASSIGNEE in the event that either both of them is subject to such suit. ASSIGNOR shall have no obligation to ASSIGNEE with respect to any liability that either or both of them shall incur as a result of any such suit or threat.

4.3    ASSIGNEE agrees that there are no any challenges or procures or assists others in a challenge to the validity of the assigned Patent rights.

2.7

4.4 ASSIGNEE shall defend, indemnify and hold harmless ASSIGNOR from and against any and all claims, demands losses and expenses of any nature, including attorney's fees, including but not limited to, death, personal injury, illness, property damage or product liability, arising from or in connection with any of the following:

(a) The use by ASSIGNEE or affiliates of any method or process covered by the Patent Rights or disclosed in the Know-How;

(b) Any use, sale or other disposition of Product by ASSIGNEE, or any statement, representation or warranty of ASSIGNEE with respect thereof.

The indemnification set forth herein shall not be applicable in the event that the claim, demand or lawsuit in question arises from the negligence or willful or improper act, of ASSIGNOR.

4.5 The ASSIGNEE shall obtain and maintain in force product liability insurance for any and all countries wherein any Assigned Product shall be manufactured, sold, distributed or advertised and shall name ASSIGNOR as one of the insured.

Article 5 – Termination:

5.1 The Agreement shall be considered to be completed in terms of assignment of patent right and right of patent application to the ASSIGNEE as soon as the fulfillment of Article 3.1a and 3.1.b by the ASSIGNEE, unless terminated sooner pursuant to the provisions of this Agreement.

5.2 Upon termination under this Article 5.2, if it should occur for any causes, as of the effective date of the termination and, from and after said effective date of termination under Article 4.2, ASSIGNEE shall have no further right to use any Know-How imparted to it by ASSIGNOR hereunder. In the event of such termination, ASSIGNEE shall have no further obligations to ASSIGNOR, except for those set out in Article 4.4 ( which is not terminable ) and to provide ASSIGNOR promptly with all data relating to the Assigned Product in its possession at the date of such termination. ASSIGNOR shall have the right to use such data provided however it chooses, including the right to supply same to a subsequent assignee. In the event that one or more applications for drug investigation or marketing approval has been filed by or granted to ASSIGNEE thereof as of

the date of termination under this Article 5.2, ASSIGNEE shall assign or procure the assignment of such application or approval to ASSIGNOR free of charge.

5.3   In the event of a breach of, of default under, this Agreement by ASSIGNEE is not cured within sixty ( 60 ) days after the receipt of written notice thereof from ASSIGNOR, ASSIGNOR shall be entitled ( without prejudice to any of its other rights) to terminate this Agreement by giving notice to take effect immediately.

5.4   ASSIGNOR shall have the right to terminate this agreement forthwith in the event of ASSIGNEE's filing the bankruptcy.

5.5   The right to terminate this Agreement pursuant to this Article 5 shall not be affected in any way by a waiver of, or failure to take action with respect to, any previous breach or default. Termination of this Agreement shall not affect the rights and/or obligations of the parties accrued prior to termination.

### Article 6 – Know-How, Information, Improvements and Confidentially:

6.1   ASSIGNOR agrees that it shall:
   a) Disclose to any of the Know-How in its possession or provided to it under this Agreement to the ASSIGNEE without any reservation and
   b) take such precautions as it normally takes with its own confidential and proprietary information to prevent disclosure to third parties ( except Affiliates and consultants as above).

6.2   The obligation of ASSIGNOR under Article 5.2 shall not, in any event, apply to any information which it can show:
   a) at the time of disclosure is, or thereafter becomes, available to the public in published literature or otherwise through no fault of ASSIGNOR; or
   b) was known to, or otherwise in the possession of, ASSIGNEE or Affiliates, or consultants of ASSIGNEE prior to the receipt of such information from ASSIGNOR; or,
   c) is obtained by ASSIGNEE from a source other than ASSIGNOR and other than one who would be breaching a commitment or confidentiality to ASSIGNOR by disclosing such information to ASSIGNEE.

### Article 7 – Patent Maintenance and Extension:

Z . 7

Rⁱ  /  ₩

7.1 ASSIGNEE shall bear the cost of obtaining patents on the patent applications set out in Article 1.5 and attends to and bears the cost of maintaining patent rights throughout the life of said rights in USA, and other countries where applicable.

7.2 Whenever it is possible and there is a reasonable prospect of success, ASSIGNEE shall apply for extension of the Patent Rights within any period prescribed for such application. It would be the responsibility of ASSIGNEE to work with its agent with respect to such filing and prosecution of action and agrees to cooperate with said agent in providing any information required under any relevant laws, and any regulations promulgated thereunder. All expenses of such proceedings shall be borne by ASSIGNEE.

7.3 The proprietary right to any improvements and modifications on the patents licensed hereby, including but not limited to patent, copyright, trade secrets and other related rights, shall be vested in ASSIGNEE.

### Article 8 - Publicity

8.1 ASSIGNOR and ASSIGNEE agree not to issue any press release or other public statement disclosing the existence of or relating to this Agreement without the prior written consent of the other party, provided, however, that neither party hereto shall be prevented from complying with any duty of disclosure or it may have pursuant to law.

### Article 9 – Notices:

9.1 Any notice or communication required or permitted to be given or made under this Agreement by one of the parties hereto the other shall be in writing and shall be deemed to have been sufficiently given or made to all purposes when mailed by certified mail, return receipt requested, postage prepaid, addressed to such other party at its respective address as follows:

TO ASSIGNOR:
Attention: Richard L Chang & Zhang Tao Han
TO ASSIGNEE:
Attention: Fred Chi-Ming Wu, Biosuccess Biotech Co., Ltd.

### Article 10 – Force Majeure

10.1    Neither party shall be responsible or liable to the other hereunder for failure or delay in performance of this Agreement due to any war, fire, accident or other casualty, or any labor disturbance or act of God or the public enemy, or any other, whether similar or dissimilar to the foregoing, contingency beyond such party's reasonable control. In addition, in the event of the eliminate, cure and overcome any of such causes and resume performance of its obligations as soon as reasonable possible under the circumstances. If either party finds that it is subject to conditions as set out in this article that may delay or preclude its performance of any of its obligations under this agreement it shall promptly advise the other thereof.

### Article 11 – Assignment and Transfer

11.1    Any subsequent applications of phorbol esters for treating patients for other diseases by the ASSIGNOR would be considered to be the rights of the ASSIGNEE. And any subsequent patents and patent applications granted for ASSIGNOR for other diseases or indications would also be considered to the right and interests of and the ownership of the ASSIGNEE.

11.2    Any " Know-How" developed subsequently relating thereafter the Agreements is in effect will also be considered to be the right and interests of ASSIGNEE.

### Article 12 – Severability

12.1    If any one or more of the provisions of this Agreement shall, for any reason be held by any court, tribunal or other authority having jurisdiction over either of the parties hereto or this Agreement, be held to be invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions here shall not in any way be affected or impaired thereby. In the event any provision shall be held invalid, illegal or unenforceable, the parties shall use their best efforts to substitute a valid, legal and enforceable provision, which, insofar as practical, implements the intent of the parties and the purposes hereof.

### Article 13 – Governing Law and Jurisdictions:

13.1 This Agreement shall be construed and the rights of the parties governed in accordance with the laws of the state of New Jersey, USA, excluding its rules relating to conflict of laws.

## Article 14 – Entire Agreement:

14.1 This Agreement constitutes the entire understanding of the parties with respect to the subject matter contained herein and may not be modified or amended except as expressly stated herein or by a written agreement duly executed by both parties hereto.

## Article 15 – Miscellaneous Provisions:

15.1 The title of the Article of this Agreement is for general information and reference only and this Agreement shall not be construed by reference to such titles.

15.2 It is expressly agreed that this agreement does not authorize either party to act or hold itself out or be held out as the agent of the other.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in duplicate by their duly authorized representatives as of the day, month and year first above written, each copy of which shall for all purposes be deemed to be an original.

ASSIGNOR: Richard L. Chang      ASSIGNOR: Zheng Tao Han

By: _Richard L. Chang_      By: _Zheng Tao Han_
Title: _CSO_  Date: _8/30/06_    Title: _____  Date: _8/30/06_

ASSIGNEE: Biosuccess Biotech Co., Ltd.

By: Name: Fred Chi-Ming Wu _____
Title: _CHAIRMAN_    Date: _8/30/2006_
_& CEO_

# EXHIBIT  C

## DECLARATION OF JON BERGLIN

I, JON BERGLIN, declare as follows:

1.     I am over eighteen years of age and am not a party to this action. I have personal knowledge of the facts stated below and could testify competently to them if required.

2.     I am currently the Chief Executive Officer of Theragene, Inc., a Delaware corporation, dba Therinova Development ("Theragene")). Theragene began doing business as Therinova Development in approximately 2011. I have been the Chief Executive Officer of Theragene / Therinova since August 30, 2006.

3.     My first contact with Ben Chang was in late July or early August 2013, when Steve Davis introduced me to Ben Chang over email.

4.     On or about August 21, 2013, Ben Chang provided me a variety of documents for the purpose of preparing a proposal for filing documents with the United States Food and Drug Administration ("FDA") on behalf of Rich Pharmaceuticals, Inc., including the submission of an Investigational New Drug Application as it relates to TPA and/or PD-616. Attached hereto as **Exhibit A**, Bates Nos. THER0001 to THER00081, are true and correct copies of my email correspondence, along with any files attached to those emails.

5.     The bates ranges starting from THER00015 thru THER00081 in **Exhibit A** are true and correct copies of my correspondence and emails with Ben Chang and David Chou, as well as the files attached to those emails.

6.     Attached hereto as **Exhibit B**, Bates Nos. THER00082 to THER0004330 are documents that I received from Ben Chang on or about August 21, 2013. These documents were delivered to me in person via flash drive by Ben Chang. The flash drive was plugged into Ben Chang's computer and the files were uploaded. I then transferred the files from the flash drive to my laptop and uploaded them to a Dropbox folder.

7.     Even though I reviewed the documents attached as **Exhibit B**, Theragene never submitted any documents to the FDA on behalf of Rich Pharmaceuticals, Inc. That is because Rich Pharmaceuticals, Inc. ("Rich Pharmaceuticals") never executed the Master Services Agreement ("MSA") found at **Exhibit A**, Bates Nos. THER00019 to THER00036.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 21st day of February 2014, at San Diego, California.

_____
Jon Berglin